STATE of Missouri, Respondent,

v.

**Eddie Douglas UMFREES and Donald Lee Beishir, Appellants.**

**No. 53002.**

Supreme Court of Missouri,
En Banc.

Nov. 12, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Richard K. Wilson, Sp. Asst. Atty. Gen., Springfield, for respondent.

Thomas P. Howe, John J. Stewart, Clayton, for appellants.

STORCKMAN, Judge.

The defendants were jointly tried and found guilty by a jury of murder in the second degree. The defendants and the victim were all inmates of the Missouri State Penitentiary at the time the offense was committed. Having been previously convicted of felonies, the defendants were each sentenced by the court under the Habitual Criminal Act, § 556.280, RSMo 1959, V.A.M.S. Both defendants were sentenced to life imprisonment. Two other inmates testified as eyewitnesses that the defendants committed the offense and there is no contention that the evidence was not sufficient to support the verdict of the jury. The questions presented on appeal relate solely to the exclusion of certain testimony offered by the defendants.

On November 27, 1965, at approximately 1:30 p. m., James Hawkes, an inmate of the penitentiary, was stabbed in the region of the heart and died almost instantly. Cecil Garnett, a guard, saw Hawkes enter the music room of the penitentiary and leave a few minutes later. A few seconds later Garnett heard a disturbance outside and found Hawkes wounded and apparently dead lying on a sidewalk. Garnett saw only one convict in the area at the time but did not recognize him. Ray Warren and Roger Turnbough, inmates of the penitentiary, testified that they saw the defendants Umfrees and Beishir approach Hawkes; that Hawkes was stabbed by Umfrees and Beishir struck Hawkes on the side of the head with a metal object.

The music room, outside of which the offense was committed, is located in the "upper yard" of the penitentiary, and the "lower yard" in which there is a handball court is at the other extremity of the penitentiary. The distance between the music room and the handball court is about two blocks or 150 yards. The defendants testified they were playing handball at the time Hawkes was killed. Numerous witnesses, all inmates of the penitentiary, corroborated the defendants' testimony that they were on the handball court at the time in question. The defense evidence was that Umfrees and Beishir were partners that day and as a winning combination continued to hold the court for a period of time which included the time when Hawkes was attacked and stabbed to death.

During the examination of John M. Warriner, testifying on behalf of the defendants, this sequence occurred:

"Q Did you have a conversation with Ray Warren on the day that Hawkes was killed, in reference to the death of Hawkes?

"MR. KINDER: Just a moment, Your Honor.

"(The following proceedings were had at the bench, outside the hearing of the jury:

"MR. HOWE: I asked Ray Warren, when he was on the stand, specifically if he made a statement to this witness in regard to the death of Hawkes.

"THE COURT: What statement?

"MR. HOWE: To the effect that he had killed—that he had taken care of Hawkes.

"MR. KINDER: I don't remember any such testimony. * * *."

At this point a recess was taken to permit the court reporter to examine his notes of Warren's cross-examination. The result of the examination was not recorded.

All the transcript shows is that in response to questions by defendants' counsel, the witness Warren testified that he did not know John Warriner by name and that he did not tell Warriner to tell Tommy Hanks who was in the hospital that he, Warren, "took care of the deal". When the court reconvened after the recess, defendants' counsel made this offer of proof:

"MR. HOWE: Your Honor, at this time I would make an offer of proof that if this witness were to testify, he would state that he did have a conversation with Ray Warren very shortly after the stabbing of Hawkes, and that he met Ray Warren coming down into the lower yard and, at that time, Hawkes said to him, 'Tell Tommy that I took care of the deal,' and that—

"THE COURT: You mean Warren said—

"MR. HOWE: Warren said to him, to tell Tommy, who was then in the hospital, that this witness worked in the hospital, tell Tommy that he took care of the deal and Tommy would know what he meant."

The state objected on the ground the statement was immaterial, speculative and did not tend to prove or disprove any fact in the case and would cloud the issues. The defendants urged its admission to show Warren "had a motive" and to show bias and interest on Warren's part in testifying. The exclusion of this testimony of defendants' witness Warriner is assigned as error. In support of this contention, the defendants cite State v. Pigques, Mo., 310 S.W.2d 942; Arnold v. Alton Railroad Co., 348 Mo. 516, 154 S.W.2d 58, and Kunz v. Munzlinger, Mo., 242 S.W.2d 536. These cases are relied on for the holdings that the interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters and the extent of the interest or bias may be shown by the testimony of others, although much is left to the discretion of the trial court as to how far the inquiry may go into the details of the difficulty, disagreement or other transaction which caused the hostility, prejudice or ill feeling. The only other case cited is State v. Solven, Mo., 371 S.W.2d 328, which was reversed and remanded because the trial court refused to permit defense counsel to bring out on cross-examination of the state's identifying witness that the witness, on advice of the circuit attorney, had refused to talk to defendant's counsel. These cases, however, fail to reach the determinative factor in this case.

█ The facts stated in an offer of proof must be specific and in sufficient detail to establish the admissibility of the evidence sought to be introduced and to demonstrate its relevance and materiality. Kinzel v. West Park Investment Corporation, Mo., 330 S.W.2d 792, 795[1]; Keeshan v. Embassy Investment Company, Mo. App., 303 S.W.2d 666, 669[1]; Rutledge v. Baldi, Mo., 392 S.W.2d 244, 248[3]. We must assume that the party making the offer of proof has stated it as fully and favorably as he can. Rutledge v. Baldi, Mo., 392 S.W.2d 244, 248[4].

█ Whether we regard the statement offered as directed at impeachment of the witness Warren or showing that he "had a motive", its relevancy and materiality has not been demonstrated. The statement offered is vague and uncertain. The "deal" referred to is not explained or described in the offer or elsewhere in the transcript. Its admission in evidence would not tend to prove or disprove any material issue. On the other hand, it would tend to create confusion and speculation. The trial court did not err in excluding the testimony offered. State v. Feltrop, Mo., 343 S.W.2d 36, 38[7]; State v. Laspy, Mo., 323 S.W.2d 713, 718[9]; State v. Arnold, 206 Mo. 589, 105 S.W. 641, 643[2].

The other point relied on by the defendants is as follows: "The trial Court erred

in excluding the testimony of Tommy Hanks who would have testified that he and the State's witness Warren ran a card game for the decedent Hawkes, that they were holding out on the decedent, and that for this reason the decedent had stabbed the witness Hanks the morning of the murder." After Thomas Dean Hanks, a witness for the defense, had testified that he and Warren ran a poker game and Hawkes backed it, the following proceedings were had at the bench, out of the hearing of the jury:

"MR. HOWE: * * * This line of questioning would be that this witness will testify that he and Warren, in running this card game for Hawkes, were holding out on him, on Hawkes; that Hawkes got word of it and, that morning, Hawkes stabbed this gentleman, which would then show that Ray Warren would have a motive for killing or for being involved in the death.

"THE COURT: I don't know that would show any motive on Warren.

"MR. HOWE: In other words, his testimony would be that he and Warren were holding out . . .

"THE COURT: Yes, but it doesn't show that Warren would have any motive to testify against these people.

"MR. HOWE: I think that would be a jury question, Your Honor.

"THE COURT: I don't think so. I think it's too far afield and too speculative. I just don't see the connection. You have made your offer, is that your whole offer?

"MR. HOWE: Yes, Your Honor.

"THE COURT: What is your objection?

"MR. KINDER: My objection is as to any dealings between these three men is too far removed and too speculative to have any probative worth and, therefore, inadmissible. It tends neither to prove or disprove any material issues in this case, nor does it tend to impeach the witness' veracity in any manner.

"MR. HOWE: It's not for impeachment. I think it certainly shows Warren could have had a motive.

"MR. KINDER: Mr. Warren is not charged.

"MR. HOWE: But he is also at the scene.

"THE COURT: I know, but you can't disprove one murder by proving another man may have committed it. That's not the issue.

"MR. HOWE: I think the nature of the testimony is certainly Warren could have committed it.

"THE COURT: Well, there are fifteen hundred other people that could have.

"MR. HOWE: But they all didn't have a reason.

"THE COURT: You don't know that Warren had a reason. We don't know whether Hawkes knew Warren was holding out on him. I'm going to have to sustain the objection."

In support of their contention that the court erred in excluding the evidence offered, the defendants rely on the same four cases cited under the first assignment of error. They are beside the point whether the offer was for purposes of impeachment or to implicate the witness Warren as a person having a motive to kill Hawkes.

■■ Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime. State v. Miller, Mo., 368 S.W.2d 353, 359–360[10, 11]; State v. Barrington, 198 Mo.

23, 95 S.W. 235, 259. See also State v. Watson, Mo., 350 S.W.2d 763. The test generally for the admission of such evidence is stated in 22A C.J.S. Criminal Law § 622 b, at page 451, as follows: "The evidence, to be admissible, must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible."

■ The testimony was remote and speculative and did not tend to connect the witness Ray Warren with the commission of the crime. Hence it could not be used to exculpate the defendants or impeach the state's witness. The trial court did not err in rejecting the evidence offered. State v. Clark, Mo., 277 S.W.2d 593, 600–601[8]; State v. Gould, 329 Mo. 828, 46 S.W.2d 886, 890[6]; State v. Taylor, 136 Mo. 66, 37 S.W. 907, 909[6].

We have considered all questions presented by the defendants and find them to be without merit. Our examination of the record as required by S.Ct. Rule 28.02, V.A.M.R., discloses no error. Accordingly, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by Storckman, J., written in Division No. 1 is adopted as the opinion of the Court en Banc.

All concur except SEILER, J., who dissents in separate dissenting opinion filed.

DISSENTING OPINION

SEILER, Judge.

I respectfully dissent, because I believe the trial court erred in its evidence rulings.

The principal witnesses on both sides of this case were acknowledged lawbreakers. The two witnesses for the state, Ray Warren and Roger Turnbough, without whose testimony the state could not have made a case, were serving sentences for armed robbery and burglary. No other witness testified to the defendants being in any way involved. The issue of whether the defendants did or did not commit the crime charged was vigorously contested and the record reveals the jury deliberated about six hours before returning the verdict, and then returned a verdict of second, not first, degree murder. The state had five witnesses in direct and one in rebuttal. The defendants had 21 witnesses. Of all witnesses on both sides, only four did not have criminal records, so most of the witnesses were somewhat tainted to begin with as to credibility. Consequently other evidence bearing on the credibility of particular witnesses would be especially important.

One of the state's eye witnesses was Ray Warren. On cross-examination he denied that he had any business dealings with the deceased, James Hawkes. Counsel for defendants then informed the court he wanted to interrogate Warren as to whether he and another inmate, Tommy Hanks, were running a card game for Hawkes and were holding out on him and that it was for this reason that Hanks was stabbed by Hawkes the morning of the same day that Hawkes was stabbed in the afternoon. The court refused to permit this line of interrogation. Warren also denied on cross-examination that he knew Hanks personally. The witness also denied that he had told another inmate, Ralph Tull, the day after the Hawkes stabbing that he (Warren) had "got" Hawkes. It was at this point that defense counsel asked Warren whether on the same day that Hawkes was stabbed he had told John Warriner, who worked in the laundry of the hospital, to tell Tommy Hanks, who was in the hospital from the stabbing occurring that morning, that he "took care of the deal." Warren denied making such statement. Tull, called as a

witness by the defense, testified that the day following the Hawkes killing, he asked Warren if he had taken care of Hawkes and Warren said, "Yes, I did." Tommy Hanks testified for the defense that he, Warren, and Hawkes were partners in a poker game; that Hanks and Warren ran the poker game and Hawkes backed it. At this point defense counsel offered to prove by Hanks that he and Warren were running the poker game for Hawkes and were holding out on Hawkes; that Hawkes got word of it in the forenoon of the day of the Hawkes killing and that Hawkes stabbed Hanks. In sustaining the state's objection to this offer of proof, the court said, "You don't know that Warren had a reason. We don't know whether Hawkes knew Warren was holding out on him." The trial court was properly considering whether the offer showed Warren had a motive to testify falsely, but as seen from the above, the court was mistaken on the facts. The offer of proof was that Hawkes *did* know about the holding out and to the extent that the court's belief to the contrary served as a basis for the trial court's ruling, the trial court obviously was in error. The testimony of Hanks was particularly vital, since it closely linked Warren with the affairs of the decedent, affairs which had taken a violent turn, and Warren's statements made to the witness Tull and to the witness Warriner became much more significant in this light.

In my opinion, the trial court also committed prejudicial error when it refused to permit the defense to show by the witness, John M. Warriner, that on the day of the Hawkes killing he had a conversation with Warren shortly after the stabbing, in which Warren said to Warriner, "Tell Tommy that I took care of the deal", and that Tommy would know what he meant.[1]

One of the state's main witnesses was prison guard Cecil Garrett. He did not see the stabbing, but the clear inference from his testimony was that the deceased, James E. Hawkes, was stabbed while *inside* the music room where there was a large crowd of convicts assembled listening to "live music", and not while outside the building; that Hawkes emerged from the music room "pale", his face white, looking as though "maybe he got sick in there, or something", in marked contrast to his jovial demeanor when he entered the hall two or three minutes earlier; that there was no one else in sight on the outside of the music hall when Hawkes came out, except a single convict near the wall of F and G hall, who beckoned to Garrett. (One of defendants' witnesses E. W. Guy, testified this was he.) Garrett also testified he was the first person to reach the dying man, who collapsed on the sidewalk only a short distance away, with blood running from his mouth and nose. Garrett testified this was just a few seconds after Hawkes emerged from the music hall. On the other hand, Warren and Turnbough testified Hawkes came out of the music room, stopped *outside* at a window near the exit, and talked to someone on the inside; that while Hawkes was talking the defendants approached from the south, Hawkes turned toward them with his hands

---

1. "Deal" as here used, by one convict to another, was obviously a slang expression and meant a successful crime. As a noun, used as slang, it means, according to the Dictionary of American Slang, by Wentworth and Flexner, published in 1960, T. Y. Crowell Company, "An unethical transaction or agreement from which both parties benefit; an unethical agreement, the trading of favors". A Dictionary of Americanisms, University of Chicago Press, 1951, p. 469, defines the slang meaning of "deal" as "A transaction or arrangement, expecially one involving secret, conniving or disreputable machinations." The jury could reasonably infer, in the context of the circumstances under which the remark was made, and without direct testimony as to what the word "deal" meant, that Warren was reporting to Hanks he had taken care of a situation which was otherwise a threat to both of them. However, if an explanation were required, we point out that the offer of proof was made as to what the witness' answer would be to the question as to whether he had a conversation with Warren "*in reference to the death of Hawkes*".

extended in a gesture of peace, and it was after this that the stabbing occurred. Warren also testified that he and another convict, Roger Knott, were in full view in the immediate area at the time, and Turnbough testified that *he* was the first person to reach Hawkes. In addition to some eleven inmate witnesses who supported the defendants' claim that they were on the handball court at all material times, defendants' witness Knott testified he saw Hawkes come out of the music hall with Warren running after him. Defendants' witness Robert Burns testified that Warren had told him he did not like defendant Beishir and was going to retaliate against the defendants because he considered they were partly responsible for a friend of his being stabbed on an earlier occasion.

It was for the jury, of course, to resolve these conflicts of fact and determine which witnesses to believe and disbelieve, but the defendants were entitled to have the rules of evidence properly applied to what the jury was permitted to hear and not to hear, and in particular with respect to evidence bearing on the issue of the credibility of the witness Warren.

It must be remembered that a considerable length of time, perhaps at least a week or ten days or more according to the only evidence in the record on the subject, elapsed before the defendants were charged with the crime *and during this interval Warren had already made several self-incriminating statements.* The record does not show the date of the complaint, but the information was not filed until August 3, 1966. The murder occurred November 27, 1965. While Warren denied at the trial that he stabbed Hawkes, defendants' evidence was that he told the witness Tull the day following the killing that he took care of Hawkes and went into details as to why. In addition, defendants tried to prove the message which Warren gave Warriner to carry to Hanks after the killing. By Warren's own testimony he was present in the immediate vicinity when Hawkes was stabbed and as earlier mentioned, one witness testified

Hawkes came out of the music room with Warren running after him. The point is that Warren was so situated that he could have committed the killing and whether his inculpatory statements were merely boasts to establish a reputation or were factual, having made such self-incriminating statements shortly after the stabbing, it was clearly to his interest to divert suspicion elsewhere. One way to accomplish this would be to aid in convicting the defendants by testifying against them. If defendants were acquitted, Warren could well believe suspicion might focus on him.

While it is proper and relevant for an accused to show that someone else committed the crime without his being involved, State v. Smith (Mo.Sup.) 377 S.W.2d 241, 245, I respectfully submit this is not what defendants were trying to do and that the majority opinion is in error in treating the case as though this were the point. The defendants were attempting to show that Warren had a motive or interest to testify falsely against them and that what he said on the subject was not to be believed by the jury. Under the theory of the defense, an explanation of why Warren would falsely accuse defendants of the crime was a material matter. The defendants were not only asserting they were elsewhere when the crime occurred—they were also asserting that Warren had several reasons for testifying falsely against them. It seems to me that the trial court improperly limited defendants' efforts to show Warren had a motive to falsify his testimony.

On the matter of testimonial impeachment, in discussing bias, corruption and interest, Wigmore on Evidence, Vol. III (3rd Ed.) § 949, p. 499 states:

"The range of external circumstances (ante, § 945) from which probably bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place. Exact concrete rules are almost impossible to formulate, and where possible are usually undesirable * * *"

Evidence that Warren had a particular reason for charging that another had com-

mitted the offense tended to affect Warren's credibility and should have been admitted. See State v. Smith, supra, 377 S.W.2d 245, a case where evidence was admitted showing the prosecuting witness' motive for falsely accusing the defendant; also the discussion by Judge Medina in United States v. Lester (C.C.A. 2) 248 F.2d 329, 334, on the admissibility of evidence showing a witness has a motive to falsify the testimony he has given. See, also, Wimberly v. State, 94 Tex.Cr.R. 252, 250 S.W. 691, 693, for the proposition that the motives of a witness in testifying are never to be regarded as merely collateral and that any testimony which sheds light on the animus, prejudice, or self-interest of a state witness toward the accused is admissible also 98 C.J.S. Witnesses § 545, p. 486, stating as follows:

"The interest or bias which a witness who is not a party has in the result of * * * criminal prosecution has a bearing on his credibility; hence it may be exposed by the opposite party."

It makes no difference that defendants did get in the testimony of Tull that Warren told him he took care of Hawkes. They were also entitled to have Warriner's testimony before the jury. Tull was shown to have convictions for armed robbery, offering violence to a guard, burglary and larceny, kidnapping, car theft, and carrying concealed weapons. His prison report, used by the state in cross-examination, also showed an offense of "lying to the warden", for which he was disciplined. By contrast, Warriner had only one felony mark against him, a conviction for robbery. The jury may well have chosen to disbelieve Warren had they also known of his statement to Warriner.

Motive and interest of a witness are never immaterial. Here material, relevant and competent evidence bearing on the motive of a key witness for testifying as he did was improperly excluded, and for that reason I would reverse the judgment and remand for a new trial.