# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1486

_____

James Eric Mansfield,                        *

                                    *

            Appellant,           *

                                    *   Appeal from the United States

      v.                           *   District Court for the Western

                                    *   District of Missouri.

David Dormire,                     *

                                    *

            Appellee.            *

_____

Submitted: September 15, 1999

Filed: February 4, 2000

_____

Before BEAM, HEANEY, and FAGG, Circuit Judges.

_____

BEAM, Circuit Judge.

     James Eric Mansfield appeals the denial of his petition for habeas corpus relief under 28 U.S.C. § 2254. We affirm.

## I.    BACKGROUND

     Mansfield was convicted in Missouri state court of first-degree murder and armed criminal action for the stabbing death of Mark Trader. He was sentenced to two concurrent terms of life imprisonment.

Before trial, the state filed a motion in limine to exclude evidence that other people had a motive and an opportunity to commit the murder. Because there was no evidence directly linking the others to the crime, the trial court granted the motion. The case then proceeded to trial before a jury.

At trial, the state presented evidence showing that Mark Trader had been stabbed to death outside his apartment after an evening of drinking. The evidence centered around a group of regular patrons and employees of Papa Leone's Italian Deli and Bar in Independence, Missouri ("the bar"). The state's principal witness was John Hertlein, a friend of Mansfield, who testified to events that occurred on the night of the murder.

Hertlein testified that he, Mansfield, and several others, including Mark Trader, had been drinking at the bar. After the establishment closed, one of their party called a cab for Mark Trader, who was too inebriated to drive. Mansfield assisted Trader into the cab and gave the cabdriver Trader's address.

At that point, Hertlein and Mansfield drove to Trader's apartment building in Mansfield's car. On the way, Mansfield stated, "I'm going to Gerber him,"[1] and then pulled a knife from under the seat of the car. When they arrived at Trader's apartment, Mansfield confronted Trader outside the apartment building. After arguing for a few minutes, Trader and Mansfield walked to a place between the two apartment buildings where Hertlein could no longer see them. Hertlein testified that he overheard Trader say, "kill me" or "try and kill me," and then heard thumping and gurgling sounds. Mansfield returned to the car with blood on his hands. Hertlein asked what had happened and Mansfield replied, "the first shot he took was in the Adam's apple" and admitted that he had stabbed Trader ten to twenty times.

---

[1]The evidence shows that the term "Gerber" refers to a kind of knife. There was also evidence that Mansfield owned such a "Gerber gator" knife and had been heard to refer to the term "to Gerber" as meaning "to stab" or "to cut."

Hertlein then took the wheel and the two men returned to the bar, where they encountered Jon David Couzens. After talking to Couzens for a few minutes, Hertlein drove to a nearby gas station so that Mansfield could clean up. Because there were people present at the station, the two decided not to use the station's restroom and drove instead to the apartment of Hertlein's cousin, Angela Cascone, where Mansfield washed and borrowed a clean shirt. Mansfield then drove Hertlein back to the deli. Hertlein then went home.

The next day, Hertlein contacted the police and was brought to the police station, where he later gave a written statement and videotaped testimony outlining the night's events. That same day, the police arrested Mansfield as he was leaving his home. Hertlein agreed to assist police officers by audiotaping a conversation with Mansfield in the hope that Mansfield would incriminate himself. Hertlein was placed in the cell next to Mansfield with two other men. Hertlein told his cell mates that he had been arrested for the murder of Mark Trader and stated that he had assisted in the murder. Mansfield made no incriminating statements in response.

Hertlein's version of the night's events was corroborated by several other witnesses. Jon David Couzens testified that Mansfield asked "why don't I just go pop him?" before leaving Papa Leone's with Hertlein and that Mansfield was holding a knife and had blood on his hands when he returned. A bar patron, Katherine Halsey, testified that she overheard Mansfield remark, "do you want me to pop him?" The cabdriver, Scott Blanz, identified Mansfield as one of the two men arguing outside Trader's apartment.[2] An elderly resident of the apartment building testified that she heard raised voices, followed by gurgling and then saw a male running from the scene. Jon David Couzens also testified that Mansfield stated, "we have a bond between us and this is to go no further, but Trader is dead, I killed him." Hertlein testified that he overheard this remark. A gas station patron testified that he saw a car matching the description of Mansfield's circling through the gas station. Hertlein's cousin, Angela Cascone,

---

[2]Blanz had also identified Mansfield in a police photographic lineup.

testified that Hertlein asked if a friend could use her bathroom to clean up and that she later heard the water running. A police officer testified that physical evidence of blood was later found in Cascone's sink. Another police officer substantiated Hertlein's testimony that he had been placed in a cell next to Mansfield to entice Mansfield into a confession.

Mansfield presented an alibi defense. Mansfield's mother testified that he was home by 2:20 a.m. on the night of the murder. An expert testified that it would have been impossible for events to have occurred as Hertlein testified they did under the time sequence that had been presented. Mansfield also testified in his own defense and denied committing the murder.

Mansfield was convicted of murder in the first degree and armed criminal action. He filed a joint motion for a new trial and for post-conviction relief, which was denied by the trial court. He then jointly appealed his conviction and filed for post-conviction relief under Missouri Rule 29.15. The Missouri Court of Appeals affirmed his conviction and denied post-conviction relief, finding that Mansfield had not properly preserved his points for review. See State v. Mansfield, 891 S.W.2d 854, 855 (Mo. App. 1995).

Mansfield then filed for habeas corpus relief in federal district court under 28 U.S.C. § 2254. He alleged violations of his Sixth Amendment right to adequate representation by counsel and violations of his Fifth Amendment right to due process of law. The state argued that Mansfield's claims were procedurally barred. The district court found the claims were not procedurally barred, but nevertheless denied relief because it found that Mansfield had not shown that his counsel's representation fell below an objective standard of reasonableness. The district court later denied Mansfield's motion for a certificate of appealability, finding that Mansfield had made no substantial showing of the denial of a constitutional right.

-4-

Mansfield moved for a certificate of appealability in this court. We found that Mansfield had made a sufficient showing of the denial of his Sixth Amendment right to effective assistance by counsel in the following particulars: (1) counsel's failure to develop and present evidence showing others were responsible for the murder; (2) counsel's failure to effectively impeach the state's chief witness with evidence that the witness had earlier implicated himself in the murder; and (3) counsel's failure to object to the state's cross-examination of defendant when the state asked defendant why the state's witnesses were lying.

## II.    DISCUSSION

As a threshold matter, the state argues that Mansfield's ineffective assistance of counsel claim is procedurally defaulted. It asserts that federal review is precluded because Missouri state courts relied on an adequate and independent state ground for its disposition of the case. Although we are inclined to agree with the district court that our review is not barred in this case, we need not reach this difficult question. Since we find that Mansfield cannot prevail on the merits, we see no need to belabor the procedural bar issue. See Barrett v. Acevedo, 169 F.3d 1155, 1162 (8th Cir. 1999) (en banc) (stating that judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner and the procedural bar issues are complicated), cert. denied, 120 S. Ct. 120 (1999).

Mansfield's ineffective assistance claims center on his counsel's failure to present evidence implicating Hertlein, Couzens, and another bar patron, J.R. Howerton, in the murder. The record shows that Mansfield's counsel was prevented from presenting such a defense by the trial court's ruling on the government's motion in limine.[3] In

[3]The court's ruling on this motion prevented Mansfield from presenting evidence relating to certain events that preceded the murder. That evidence included testimony that Trader had been drunk and obnoxious at the bar earlier on the night of the murder and had been involved in a physical fight with Couzens and Howerton. Mansfield was also barred from presenting evidence showing that Trader had been involved in a

connection with that ruling, Mansfield contends that counsel was ineffective in failing to present to the court a police report that stated that Hertlein had been overheard in jail bragging that he was responsible for the murder. The record shows that the report was obtained at the behest of Mansfield's counsel, who asked that the police interview the prisoners who had shared a cell with Mansfield and Hertlein. Mansfield's counsel was thus aware of the existence and contents of the report. Mansfield argues that, had this evidence been presented, the trial court would not have prevented him from mounting the defense that Couzens, Hertlein and Howerton were responsible for the murder.

To prevail on his ineffective assistance of counsel claim, Mansfield must first show that his attorney's performance fell below an objective standard of reasonableness and must further show that the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). With respect to attorney performance, Mansfield must overcome the strong presumption that "the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). To show prejudice, Mansfield must establish a reasonable probability that he would have been acquitted absent the allegedly unprofessional error. See Strickland, 466 U.S. at 694. We do not set aside a conviction or sentence solely because the outcome would have been different but for counsel's error, rather, the focus is on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

---

botched drug deal with Couzens and owed Couzens and Howerton money. However, if Mansfield's counsel had been permitted to delve into these earlier events and the relationships between the parties, the state could have presented evidence that Mansfield had also been involved in physical altercations with Trader and had been known to have violent outbursts. Additionally, evidence that Couzens, Hertlein, and Howerton may have had a motive to kill Trader could have been equally damaging to Mansfield in that the state sought to show that Mansfield was a "wise guy wanna be," who wanted to prove his toughness to the others and who had bragged about his violent exploits. In light of the comment, "do you want me to pop him?" a jury could have imputed the others' motive to Mansfield, with Mansfield in the role of a "hit man."

The trial court granted the government's motion in limine in reliance on State v. Umfrees, 433 S.W.2d 284, 287-88 (Mo. 1968) (en banc).[4] That case provides that evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible "without proof that such other person committed some act directly connecting him with the crime" and evidence that clearly points to someone other than the accused as the guilty person. Id. at 288. Mansfield asserts that the police report furnishes such direct proof of others' involvement.[5]

We question the value of Mansfield's purported evidence. In light of Hertlein's testimony, corroborated by a police officer, that Hertlein had been "planted" in the cell

_____

[4]We address this issue of state law only as it relates to the issue of effectiveness of counsel. Admission of evidence is generally a question of state law that will not form the basis for habeas corpus relief. See Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994).

[5]The parties debate whether the "Umfrees rule" requires only direct evidence that links another to the crime or instead requires evidence that clearly exonerates the accused. The district court found that Mansfield's purported evidence "did not tend clearly to exonerate" him. Whatever the subtle distinctions between "evidence that clearly exonerates," and "evidence that points to others as the guilty persons," the import is the same—the evidence must tend to show that someone else did it. Such evidence generally exonerates the accused. Mansfield's purported evidence, however, while it may point to others, does not do so to the exclusion of Mansfield. Cases allowing admission of evidence that another committed the crime involve direct evidence that points to the others and excludes the accused. See, e.g., State v. Butler, 951 S.W.2d 600, 606-08 (Mo. 1997) (en banc) (involving evidence linking victim's nephew, not husband, to the crime); State v. Woodworth, 941 S.W.2d 679, 692 (Mo. App. 1997) (involving a prior statement by victim that another was his assailant); State v. Wells, 804 S.W.2d 746, 748 (Mo. 1991) (en banc) (involving a letter from an eyewitness clearly implicating another and exonerating the accused). See also State v. Rousan, 961 S.W.2d 831, 848 (Mo. 1998) (en banc) (finding no direct evidence to connect another to the crime but noting that evidence that another contracted for the murder would inculpate rather that exculpate the accused), cert. denied, 118 S. Ct. 2387 (1998).

next to Mansfield in order to obtain a taped confession, any admissions he made in the jail cell can be explained as part of the scheme to trick Mansfield into confessing. The report thus lacks any real probative value. In addition, we find the statements by the other prisoners are equivocal and contradictory. One prisoner stated that Hertlein said that "three of them" followed the cab and each one stabbed Trader. Another prisoner stated that Hertlein said that he had stabbed the victim and the others watched. Significantly, none of the statements exclude Mansfield as a perpetrator.

Most importantly, the police report only substantiates evidence that the trial court actually heard. Hertlein himself testified that he had made the admissions at the jail. The trial court heard the substance of the evidence that supposedly incriminated others and could have reversed its ruling on the motion in limine had it been inclined to do so.

We are not convinced that the police report amounts to evidence that satisfies the Umfrees standard. Mansfield's purported evidence would show only that he either aided or was aided by others in the murder, or that he committed the murder at the behest of others. It does not point to others as the guilty persons to the exclusion of Mansfield. We thus find it doubtful that the presentation of this evidence would have caused a contrary ruling by the trial court.

Thus, we find Mansfield's counsel's failure to present this evidence to the court was not objectively unreasonable. Counsel may have had compelling strategic reasons for his failure to press the evidence upon the court. Counsel could have reasonably assumed that the evidence was damaging to Mansfield's case, in that it undermined his alibi defense. The statements also could have been viewed as damaging in that they provided further corroboration of Hertlein's version of events. The evidence lacked any real benefit to Mansfield because it was "explained away" by Hertlein's testimony that the statements were part of a ruse to get Mansfield to confess.

-8-

Moreover, even if Mansfield were able to show that his counsel's actions were objectively unreasonable, he is unable to show prejudice. Contrary to Mansfield's assertions, the state's case against him was not weak.[6] The damaging testimony by Hertlein was corroborated by the testimony of several others, most importantly, the cabdriver. Although the cabdriver later faltered in his identification of Mansfield by testifying at trial that the perpetrator had a mustache, Mansfield's counsel pointed the inconsistency out in closing argument. We have reviewed the record and find that Mansfield has not shown that the result of his trial is unreliable or the proceeding was fundamentally unfair. We have considered Mansfield's other arguments and find them lacking in merit.

To the extent that Mansfield contends he is actually innocent of this crime, we add that a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. See Herrera v. Collins, 506 U.S. 390, 404 (1993). "[T]he traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." Id. at 417.

---

[6]In support of his contention that the case against him was weak, Mansfield points to the lack of any apparent motive and to the state's inability to find evidence of blood in his car through the use of Luminol. Neither of these undermine the state's case to any significant degree. The lack of a motive was due, in part, to the exclusion of evidence of Mansfield's propensity for violence and revenge. The absence of Luminol evidence is not particularly probative because, although Mansfield had blood on his hands and clothing, there was no showing that there was any abundance of blood present in the car. In addition, both of these points were argued to the jury.

-9-

## III. CONCLUSION

The district court's denial of Mansfield's petition for a writ of habeas corpus is affirmed.

HEANEY, Circuit Judge, dissenting.

While in custody, Hertlein admitted to at least four people that he was an active participant in the murder of Mark Trader. I cannot excuse counsel's failure to present this evidence to the trial court as simply an acceptable trial strategy. Had this evidence been presented, the trial court would have had reason to admit the evidence referred to in footnote three of the majority's opinion--evidence that was consistent with Mansfield's theory of defense.

As explained by the majority, Mansfield presented an alibi defense at trial. Clearly in such a defense, evidence of another's motive and opportunity to commit the crime is of great importance, for it provides the jury with an explanation of who, if not the defendant, may be guilty. However, under Missouri law at the time of Mansfield's trial, he was prohibited from presenting evidence of another's motive and opportunity to commit the crime unless he could provide the trial court with some direct link connecting the alleged perpetrators to the crime. See State v. Umfrees, 433 S.W.2d 284, 287-88 (Mo. 1968) (en banc).

Mansfield had an abundance of evidence which tended to prove that Hertlein, Couzens, and Howerton had both a motive to commit the murder and the opportunity to do so. However, as stated above, under Missouri law this evidence was inadmissible without some other evidence directly linking them to the crime.

Such evidence was available in this case, but Mansfield's counsel failed to present it. Officer Cavanah's police report details his interviews with four inmates, Joseph Snodgrass, Leonard Berryman, Nick Nichols, and Jessie Kessler, each of whom

-10-

indicated to him that Hertlein admitted involvement in the murder while in jail with them. According to Cavanah,

> Snodgrass stated that the other person who was talking believed to [be] Hertl[ei]n made many statements about the homicide as if he knew about it. He made the statement that the suspect [sic] had been stabbed 21 times. It was obvious to him that Hertl[ei]n knew about the murder as if he were there.
>
> Berryman stated something about putting the dude in a cab and three of them followed him to his house. Hertl[ei]n stated that all 3 of them got out and each one stabbed him. He stated that [Mansfield] played dumb as if he did not know what was going on. He stated that he told [Mansfield] that [Hertlein] was involved by the way he was talking.
>
> Nichols stated that Hertl[ei]n stated that we all stabbed him. He stated that [Hertlein] stated that he was involved and that he and two others stabbed the victim. . . .
>
> Kessler stated that he heard Hertl[ei]n say that he stabbed him 9 times and that a couple other people helped him watch.

(Appellant's Add. at 39-40.)

To consider these statements equivocal and contradictory requires an overly critical reading of the statements. All of the inmates agreed that Hertlein's statements made it clear that he was involved; three of the inmates noted that Hertlein was bragging about personally stabbing the victim. Although there are inconsistencies among the statements, one would expect such an outcome from different witnesses, each relating his recollection of the events. Moreover, despite their minor differences, all the statements have a common thread: all directly link Hertlein to the crime, meeting Missouri's threshold evidentiary requirement. In such a context, it is indisputable that not presenting the police report in question to the trial court was deficient conduct by counsel.

-11-

The majority regards these confessions by Hertlein to be of little probative value, in part because Hertlein testified about them at trial. I disagree. During his trial testimony, Hertlein admitted that he told his fellow inmates that he was being held for first degree murder, but claimed he was doing so as part of a plan to elicit a confession from Mansfield. Standing alone, this would likely not satisfy the Umfrees standard. However, Hertlein's statements in the police report contain a disturbing amount of detail of the crime, calling into question Hertlein's professed innocence, and at the very least directly linking him to the crime. Thus, had the police report been presented to the trial court, it would have provided a sufficient link between Hertlein and the crime for the trial court to have then properly admitted motive and opportunity evidence.

Failing to present the police report to the trial court was deficient performance under the familiar test of Strickland v. Washington, 466 U.S.668, 687 (1984). Because I believe that counsel's failure to present this evidence produced an unreliable result, Mansfield's petition should be granted.[7]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[7]The other evidence introduced against Mansfield was weak. Most of the incriminating evidence was provided by Hertlein, Howerton, and Couzens, the same three individuals whom Mansfield claimed were the true perpetrators. Thus, had evidence of their motive and opportunity to commit the murder been admitted, the jury may well have discredited their testimony as self-serving. That being the case, the most damaging independent testimony against Mansfield would have been the cabdriver's eyewitness identification, which was impugnable because it was inaccurate.