**STATE of Missouri, Respondent,**

v.

**William ROUSAN, Appellant.**

No. 79566.

Supreme Court of Missouri, En Banc.

Jan. 27, 1998.

Rehearing denied Feb. 24, 1998.

834

COVINGTON, Judge.

Appellant, William L. Rousan, appeals from convictions for two counts of first degree murder, section 565.020.1 [1], for which he received one sentence of death and one sentence of life imprisonment without the possibility of parole. Affirmed.

The evidence is viewed in the light most favorable to the verdicts. On September 21, 1993, appellant, appellant's son, Brent Rousan, and appellant's brother, Robert Rousan, met and discussed stealing cattle from Charles and Grace Lewis. Charles Lewis, sixty-seven, and his wife, Grace, sixty-two, lived near the farm where appellant resided. Having devised a plan, the Rousans set out for the Lewis farm. On the way, they discussed killing Mr. and Mrs. Lewis. They agreed that "if it had to be done it had to be done."

As appellant, his brother, and his son drove past the Lewis farm, appellant pointed out the cattle that they would be stealing. Appellant parked his truck approximately two miles from the farm. He got out of the truck and removed a .22 caliber rifle that belonged to his girlfriend, Mary Lambing. He loaded the rifle for use in the crime "in case anyone was home." Appellant and his son then argued over who would carry the gun. Brent, the son, said that he was "man enough to do whatever needed to be done and that he would use the weapon." Appellant at first stated that Brent was not man enough, but eventually gave him the gun. He warned Brent that if they were caught, they would "fry." The three men then hiked through the woods to the Lewis farm where they waited under cover behind a fallen tree.

Between 3:00 p.m. and 4:00 p.m. that afternoon, Mr. and Mrs. Lewis returned home. Mr. Lewis began to mow the lawn. Mrs. Lewis spoke on the phone to the couple's oldest daughter, who called at approximately 4:00 p.m.

Brent grew tired of waiting and exclaimed that he wanted to "do it." Appellant told Brent to wait until appellant and Robert had secured the house. Appellant headed for the front door and Robert made his way to the

Elizabeth Unger Carlyle, Lee's Summit, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

---

1. All references are to RSMo 1994 unless otherwise indicated.

back door. Before they arrived at the home, Mr. Lewis saw Brent and called out. Brent fired at least six shots from the rifle, all of which struck Mr. Lewis. Mr. Lewis died as a result of the multiple gunshot wounds.

Mrs. Lewis, speaking by telephone with her daughter, told her daughter that she heard gunfire and hung up the telephone. As Mrs. Lewis exited the house through the front door, Brent shot her several times. Although the bullets fractured both of Mrs. Lewis's arms, the wounds were not fatal. Mrs. Lewis ran back into the house. Appellant followed her, removed a garment bag from a coat rack, placed the bag over Mrs. Lewis's head and the upper part of her body, picked her up, and carried her outside. When appellant placed Mrs. Lewis on the ground, she was alive. Appellant turned to Brent and instructed him to "finish her off." Brent fired one shot into the left side of Mrs. Lewis's head. The shot killed her.

The three men wrapped the bodies in a tarpaulin and tied it with a rope. Appellant instructed that they should pick up the shell casings and clean up the blood stains. After doing so, the men deposited the bodies near a shed and left, planning to return later to get the bodies and the cattle.

The three men, along with Jerry Rousan, another of appellant's brothers, returned to the Lewis farm that night. There, they loaded the bodies into Mr. Lewis's truck. They took two cows, a VCR, jewelry, soda, two gas cans, and a saddle. The four men then returned to Mary Lambing's farm, where appellant lived. On the return trip, Brent bragged about the murders.

At the Lambing farm, the men buried Mr. and Mrs. Lewis in a shallow grave by the barn. After digging the grave and placing the bodies in it, the men poured concrete over the bodies. They covered the grave with a pile of manure. They burned rags used to clean the blood from the Lewis house.

The men disposed of the Lewises' property in various ways. On the night of the murders, the men consumed the soda. The cows were later sold at auction. Robert gave the VCR to his sister and brother-in-law, Barbara and Bruce Williams, on the day following the murders. Mr. and Mrs. Williams sold the VCR to a local pawn broker approximately eight months later. Appellant buried the couple's personal items. He gave the remainder of the jewelry to Mary Lambing on special occasions during the following year. The four men hid and later burned Mr. Lewis's truck.

When the Lewises' daughter could not reach her parents the following day, she became concerned. She called the police, who undertook an investigation into the Lewises' disappearance. The police investigation continued for nearly a year without an arrest.

Nearly a year after the disappearance of Mr. and Mrs. Lewis, on September 15, 1994, Bruce Williams, the brother-in-law to whom Robert Rousan had given the stolen VCR, made a telephone call to the police, believing his call to be anonymous. Bruce Williams told the police where the person who killed Mr. and Mrs. Lewis lived. The police traced the call to Mr. Williams. They interviewed him and later obtained additional information from Robert Rousan. The police attempted to contact appellant at Mary Lambing's farm. The officers confronted appellant, and appellant fled.

On September 20, 1994, appellant contacted Bruce Williams to ask for a ride to a barn in Washington County. Williams took appellant to the barn, then notified the police. Appellant, armed with a .22 caliber rifle, was arrested at the barn without incident. He was taken to Washington County Sheriff's Department. There, the officers advised appellant of his Miranda rights and questioned him.

Appellant provided information that implicated him in the murders. He told the police that he had first met the victims in 1975. He saw them again in 1989 after he escaped from custody in the State of Washington and sought refuge at the Lewises' farm. When Mr. Lewis discovered appellant hiding in his barn, he fed him, clothed him, and when appellant left the farm two weeks later, Mr. Lewis gave him twenty dollars. Shortly after that time, appellant was apprehended and returned to prison.

After release from prison in June of 1993, appellant returned to the farm to thank Mr. and Mrs. Lewis for their kindness and to rekindle their friendship, he said. According to appellant, Mrs. Lewis was in poor health. Appellant explained that Mr. Lewis asked appellant to kill Mrs. Lewis to put her out of her misery and to kill him because he did not want to live without his wife. Appellant also claimed that he was hired by Charles Lewis, IV, son of Mr. and Mrs. Lewis, to kill them in exchange for fifty-thousand dollars. Appellant maintained, however, that his actual motivation for the murders was mercy.

The police discovered the Lewises' bodies at Mary Lambing's farm. They also discovered the murder weapon and various articles of the Lewises' personal property there. Appellant was charged with the murder of Charles and Grace Lewis.

The jury found appellant guilty of two counts of first degree murder. At the penalty phase, the state introduced evidence of appellant's prior convictions for rape, assault, escape, and unlawful possession of a firearm. In addition, the state presented testimony from family members of Mr. and Mrs. Lewis with respect to the impact of their deaths on the family. Appellant presented testimony of friends and family members in mitigation of punishment.

The jury recommended that appellant be sentenced to death for the murder of Grace Lewis. The jury found five statutory aggravating circumstances: that appellant was convicted of rape in the second degree and assault in the second degree; that the murder was committed while appellant was engaged in the unlawful homicide of Charles Lewis; that appellant directed Brent Rousan to murder Mrs. Lewis; that Mrs. Lewis's murder involved depravity of mind because she was killed after being rendered helpless; and that the murder was committed while appellant was engaged in a robbery. The jury also recommended that appellant be sentenced to death for the murder of Charles Lewis. The jury found four statutory aggravating circumstances with respect to his murder.

The trial court sentenced appellant to death for the murder of Grace Lewis and life imprisonment without the possibility of parole for the murder of Charles Lewis.

## I.

Appellant alleges that the trial court erred in sustaining the state's challenge for cause to venirepersons Cowan, Henkin, and Davis.

■■■ Venirepersons may not be excluded from the jury simply because they state general objections to the death penalty or express conscientious or religious scruples against its infliction. *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2050–51 (1987). Venirepersons may be excluded only where their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). If it appears that a venireperson cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case, then the juror can be stricken for cause. *See State v. Debler*, 856 S.W.2d 641, 645–46 (Mo. banc 1993)(discussing death-qualification of venire).

■■■ The qualifications of a prospective juror are not determined conclusively by a single response, but are determined on the basis of the voir dire as a whole. *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). Because the trial court is in the best position to evaluate the venireperson's commitment to follow the law, it has broad discretion in determining the qualifications of a prospective juror. *Id.* The trial court's ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *Id.*

During the state's voir dire, venireperson Cowan expressed doubt that he could vote for the death penalty. He also stated that "there would have to be no doubt at all" before he would vote to impose the punishment of death and that he probably would require more proof of guilt in a capital case than in other cases. In response to later questions, however, Cowan equivocated about

his ability to follow the law. Cowan stated that he could sign the death verdict if he were foreman. During the defense's voir dire, Cowan stated a number of times that he could follow the law, but also stated once that he was not sure he could do so. When later questioned by the court and by the state, Cowan stated that he was not sure whether he would require extra proof in a capital case and that he was not sure that his nerves would "hold up" during the trial. Based in part on Cowan's increasing indications of stress during voir dire, the court sustained the state's motion to strike Cowan for cause.

■ The record supports the trial court's ruling. Cowan expressed ambivalence about whether he could impose the death penalty, and he stated that he probably would require a higher burden of proof in capital cases. Cowan's statements provided a basis for the trial court to conclude that Cowan's views on the death penalty would substantially impair his ability to follow the court's instructions. *See State v. Gray,* 887 S.W.2d 369, 382–83 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995)(upholding strike for cause based on venirepersons' doubts that they could apply correct burden of proof). The fact that Cowan changed his answer when questioned by appellant's counsel does not require a different conclusion. "Where there is conflicting testimony regarding a prospective juror's ability to consider the death penalty, the trial court does not abuse its discretion by giving more weight to one response than the other...." *State v. Roberts,* 948 S.W.2d 577; 597 (Mo. banc 1997). Considering the voir dire as a whole, the trial court did not abuse its discretion in sustaining the state's motion to strike venireperson Cowan for cause. *See id.* (upholding trial court's decision to strike juror for cause after equivocal and conflicting statements regarding imposition of the death penalty); *see also State v. Clemons,* 946 S.W.2d 206, 225 (Mo. banc), *cert. denied,* — U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997)(finding "equivocal and shifting" responses to questions sufficient rationale to sustain strike for cause).

Venireperson Henkins stated unequivocally that she could not vote for the death penalty. She later stated to appellant's counsel, "I can't conceive of me voting that way." In response to further questioning about whether she could set aside her opinion for purposes of doing her duty as a citizen, however, Henkins offered, "I believe so."

■ The record shows that venireperson Henkins repeatedly and unequivocally indicated that she could not vote for the death penalty. Despite her one equivocal statement to the contrary, the trial court clearly did not err in sustaining the state's motion to strike venireperson Henkins for cause. *See Roberts,* 948 S.W.2d at 598 (upholding strike of venireperson Laramie).

Venireperson Davis initially equivocated about whether he could vote for the death penalty. In response to further questions from the state about voting for the death penalty, Davis stated, "It would be very hard, I honestly do not know if I could do this." The state then asked whether Davis could sign the death verdict if he were the foreperson. Davis stated "no" and then repeated that he would be unable to do that. During the defense's voir dire, Davis stated, "I honestly don't know that I could vote for the death penalty." He later repeated his uncertainty regarding his ability to impose this punishment.

■■ There is no requirement that it appear with unmistakable clarity that a venireperson will automatically vote against the imposition of capital punishment. *Kreutzer,* 928 S.W.2d at 866. A juror's equivocation about his ability to follow the law in a capital case together with an unequivocal statement that he could not sign a verdict of death can provide a basis for the trial court to exclude the venireperson from the jury. *Id.* at 866–67. In this case, the totality of Davis's answers in voir dire indicate that the trial court did not abuse its discretion in finding that Davis's views about capital punishment would substantially impair the performance of his duties as a juror. *Id.*

■ Appellant contends that the trial court was bound by each venireperson's affirmative response to defense counsel's inquiries whether each could set aside personal

feelings and follow the law. Appellant's contention disregards the requirement that the court must consider every factor relevant to determining a potential juror's qualifications. *See Kreutzer*, 928 S.W.2d at 866. Although the juror's ability to follow the law is the ultimate issue in capital cases, the court may, and should, consider a venireperson's answers to all questions relevant to this issue, not just the questions phrased in one particular way. In each of these cases, the totality of the voir dire establishes that the trial court did not abuse its discretion in sustaining the state's motion to strike for cause.

## II.

■ Appellant alleges that the trial court erred in overruling appellant's motion for judgment of acquittal for the murder of Charles Lewis because the evidence was insufficient to prove that appellant deliberated on Mr. Lewis's death. This Court's review of a claim of insufficient evidence is limited to determining whether the evidence is sufficient to persuade any reasonable juror as to the element of a crime beyond a reasonable doubt. *State v. O'Brien*, 857 S.W.2d 212, 215 (Mo. banc 1993). In making this determination, the evidence is considered in the light most favorable to the prosecution. *Id.* at 215–16. Evidence and all reasonable inferences therefrom that support a finding of guilt are considered as true. *Id.* at 216. Conversely, the evidence and any inferences to be drawn therefrom that do not support such a finding are ignored. *Id.*

■ To convict a defendant of first degree murder on a theory of accomplice liability, the state must prove that the accomplice deliberated upon the murder; the element of deliberation cannot be imputed. *Id.* at 217–18. Deliberation means cool reflection upon the victim's death for some amount of time, no matter how short. *Id.* at 218. A submissible case of accomplice liability for first degree murder exists where there is some evidence that the accomplice made a decision to kill the victim prior to the murder from which the jury could infer that the accomplice coolly deliberated on the victim's death. *See Gray*, 887 S.W.2d at 376–77.

■ Ordinarily, deliberation must be proved through evidence of circumstances surrounding the killing. *O'Brien*, 857 S.W.2d at 218–19. For accomplice liability, circumstances that can support an inference of deliberation must be those properly attributable to the accomplice. *Gray*, 887 S.W.2d at 376–77; *O'Brien*, 857 S.W.2d at 219. This Court has outlined three circumstances highly relevant to determining whether accomplice liability may be inferred for first degree murder: first, the defendant or a co-defendant in the defendant's presence made a statement or exhibited conduct indicating an intent to kill prior to the murder; second, the defendant knew that a deadly weapon was to be used in the commission of a crime and that weapon was later used to kill the victim; and third, the defendant participated in the killing or continued with a criminal enterprise after it was apparent that a victim was to be killed. *Gray*, 887 S.W.2d at 376–77.

■ The evidence in this case viewed in the light most favorable to the prosecution includes all three circumstances enumerated in *Gray*, as well as additional evidence from which a reasonable juror could have found beyond a reasonable doubt that appellant deliberated upon the death of Charles Lewis. At the trial, Robert Rousan testified that while he, Brent, and appellant were in the truck headed to the Lewises' farm, the subject of killing the Lewises arose. Either appellant or Brent stated, "if it had to be done it had to be done." When approaching the Lewis farm, appellant pulled out a semi-automatic rifle and loaded it for use in the commission of the crime, stating that the gun was in case anybody was there.

Robert further testified that at that point Brent stated "that he felt that he was man enough to do whatever needed to be done and that he would use the weapon." Appellant responded that he was not sure that Brent was "man enough," but eventually handed Brent the weapon. After appellant, Brent, and Robert had been waiting outside the Lewises' residence, Brent exclaimed that if they were going to do anything, they would do it now and not waste anymore time. Robert understood Brent to mean they were going to kill the Lewises. Appellant told

Brent to wait until appellant and Robert secured the house. After appellant and Robert left to secure the house, the killing started.

Brent shot Mr. Lewis to death and then shot Mrs. Lewis, breaking her arms. Mrs. Lewis ran inside her house. There, appellant grabbed Mrs. Lewis, dragged her from the house, and directed Brent to "finish it" by killing her. Appellant then oversaw the disposal of the Lewises' bodies and the theft of their property. In sum, Robert's testimony provided evidence that appellant, or a co-conspirator in his presence, expressed an intent to kill Mr. Lewis, that appellant knew that the semi-automatic weapon that killed Mr. Lewis was to be used in the crime, and that appellant continued—and, in fact, directed—the criminal enterprise after Mr. Lewis's murder.

Furthermore, appellant's own statement, which was introduced at trial, provided more than enough evidence for the jury to conclude that he deliberated upon the murder of Mr. Lewis. In his statement, appellant discussed his decision to kill the Lewises. Appellant stated that the Lewises, and later one of the Lewises' sons, asked appellant to kill Mr. and Mrs. Lewis. Appellant stated that during one of his visits with Charles Lewis, appellant agreed to kill both Mr. and Mrs. Lewis.

Appellant provided additional evidence of his deliberation on the murder of Mr. Lewis in his statements regarding the day of the murder. In appellant's recorded statement, appellant described the trip to the Lewises' farm: "We left the house. Robert and Brent, they thought we were going to steal some cattle. We weren't going to steal no cows. I didn't tell them, I didn't want them to know. I didn't even know if I could do what I was setting out to do anyway." Sergeant Conway testified that appellant told him that on the way to the scene of the crime appellant said to Brent that if they got caught, "they would all fry." Regardless of whether the jurors believed all of appellant's statements to the police, his own version of the events provided numerous bases for the jurors to conclude that appellant made a decision to kill Mr. Lewis prior to the murder and coolly reflected upon it.

The evidence in this case was sufficient to submit the charge of murder in the first degree to the jury. *See id.* at 377.

### III.

Appellant alleges that the trial court erred in admitting evidence of appellant's uncharged misconduct in violation of appellant's right to a fair trial. During the state's case in chief, the state introduced into evidence a statement made by appellant in which he admitted murdering the Lewises. In his statement, appellant referred briefly to incidents of past illegal activity, including an escape from prison, a rape conviction, an assault conviction, a federal fire-arms conviction for stealing a gun, and drug-paraphernalia smuggling. With respect to the smuggling, specifically, appellant stated that an old friend of his, Chris Peters, introduced appellant to Charles Lewis, IV, who offered appellant fifty thousand dollars to kill the Lewises. When asked how appellant knew Chris Peters, appellant responded that they used to run drug paraphernalia from Belize into the United States.

■ Appellant preserved his objection to the admission of the reference to appellant's smuggling drug paraphernalia. As appellant acknowledges, however, appellant failed to object at trial to the other references to uncharged misconduct. In addition, appellant failed to include his challenge to these other references of uncharged misconduct in his motion for new trial. Consequently, appellant failed to preserve, and this Court declines to review, appellant's challenge to the admission of the references to uncharged misconduct other than appellant's reference to smuggling drug paraphernalia.

■ The general rule is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). A number of exceptions, however, allow the introduction of evidence of other crimes where the evidence has some legitimate tendency to establish the defendant's

guilt. *Id.* If the probative value of such evidence outweighs its prejudicial effect, then it is admissible. *Id.*

 Even assuming that this Court might, had it been sitting as a trial court, have redacted the reference to appellant's smuggling drug paraphernalia, there is no prejudice in the reference not having been redacted. Appellant's reference to running of drug paraphernalia constituted less than thirty seconds of an approximately fifty minute confession. The statement was made only to explain appellant's connection to Chris Peters. Appellant's past conduct in smuggling drug paraphernalia was distinct in nature, time, and place from the crime for which he was being tried. The state did not use appellant's involvement in this misconduct to argue that it showed his bad character or his propensity to commit any crimes. In fact, the state never mentioned this uncharged misconduct at all. Considering the overwhelming evidence of appellant's guilt, the limited threat of prejudice from the admission of his reference to smuggling drug paraphernalia would not warrant a reversal even if its admission were error. *See Roberts*, 948 S.W.2d at 592.

### IV.

Appellant asserts that the trial court erred when it denied a mistrial and refused to strike the testimony of Bruce Williams concerning appellant's statement that he "finished off" Grace Lewis. Appellant's objection to Williams's testimony was that the state had failed to disclose the substance of appellant's statement to Williams pursuant to appellant's discovery request. Appellant claims that the trial court's refusal to strike the testimony or grant a mistrial violated appellant's rights to effective assistance of counsel, to confront and cross-examine adverse witnesses, and to due process of law.

During the state's case in chief, appellant's brother-in-law, Bruce Williams, testifed about appellant's statements to Williams regarding the Lewises' murder. The prosecutor asked Williams, "Did the defendant, sir, make any statements to you about what had become of Charles and Grace Lewis?" Williams replied, "Yes sir." The prosecutor then asked, "What did he tell you?" Williams replied, "He told me his boy shot them, that he had to finish them off." The prosecutor asked, "He said that he himself had finished them off?" Williams answered, "Yes." The trial court denied appellant's request to strike the evidence and for a mistrial.

 Rule 25.03(A)(2) requires the state, upon written request of defendant's counsel, to disclose the substance of any oral statements made by the defendant that is in the possession or control of the state. It is far from clear whether the state was aware of the substance of Williams's recitation of appellant's alleged statement that he shot the Lewises. *See State v. Oldham*, 743 S.W.2d 547, 549 (Mo.App.1987)(finding no violation of Rule 25.03 because record showed that prosecution was unaware of evidence before witness testified). The trial court may well have been correct in suggesting that Williams was trying to "embellish" his testimony. Assuming, however, that the state violated Rule 25.03, the trial court did not err in refusing to strike Williams's testimony or to declare a mistrial.

 The sanction to be imposed for a violation of Rule 25.03 lies within the discretion of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant. *Id.* Fundamental unfairness exists where there is a reasonable likelihood that the failure to disclose the evidence affected the result of the trial. *Id.*

The state's alleged violation of Rule 25.03 caused no fundamental unfairness because the undisclosed evidence was rejected by the jury. Williams's contention that appellant stated that he shot the Lewises was contrary to both parties' theories of the case. The state contended that only Brent shot the Lewises and that appellant merely aided Brent in doing so. If the jury had believed that appellant had shot the Lewises himself, as Williams suggested, then the state could

not have convicted appellant on the sole theory the state submitted to the jury in the guilt phase—accomplice liability. Because the jury found that appellant was an accomplice in Brent's act of killing the Lewises, the jury necessarily rejected the very evidence about which appellant complains. Thus, the defense could not have benefited by more successfully impeaching the truth of Williams's testimony. Because the jury discounted the contested evidence, its earlier disclosure to the defense would not have affected the outcome of the trial.

The state's failure to disclose the substance of Williams's testimony did not affect the result of the trial for an additional reason. The defense adequately challenged the evidence in the same manner as it would have if the evidence had been disclosed earlier. See id. at 66–67. The defense effectively cross-examined Williams about whether appellant actually made the statement. Williams's testimony as to the content of the statement changed, and he was vague as to the details surrounding it. The defense also impeached Williams with the testimony of the police officer who interviewed him. Williams testified that he told the officer about the statement, but the officer said that Williams never told him that appellant made such a statement. This Court notes additionally that the defense did not request a continuance to formulate a response to the newly discovered evidence. When belated disclosure produces no change in the conduct of the trial, it follows that the outcome of the trial has not been effected.

The trial court did not abuse its discretion in denying the sanctions requested by the defense.

## V.

Appellant contends that the trial court erred in admitting, over his objection, seven 5" × 7" photographs of the victims, state's exhibits 56 through 62, because they were gruesome.

▮ The trial court is vested with broad discretion in the admission of photographs. *State v. McMillin*, 783 S.W.2d 82, 101 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony. *See State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). A photograph is not rendered inadmissible simply because other evidence described what is shown in the photograph. *Id.* at 11. If a photograph is relevant, it should not be excluded simply because it may be inflammatory. As with other relevant evidence, a photograph should not be excluded from evidence unless its prejudicial effect is greater than its probative value. *Id.* at 11. Insofar as photographs tend to be shocking or gruesome, it is almost always because the crime is shocking or gruesome. *Id.*

▮ State's exhibit 56 depicts the blue tarpaulin in which Mr. and Mrs. Lewis were wrapped and buried and depicts the Lewises' bodies after they were recovered. State's exhibit 57 depicts the bodies wrapped in a plastic wrapping. Because the bodies had lain in the ground for approximately a year, they were decomposed. Although upsetting and unpleasant to view, the photographs showed the condition and location of the Lewises' bodies and assisted the jury in understanding the pathologist's testimony. Furthermore, the exhibits tended to corroborate the testimony of Robert Rousan, one of the state's key witnesses, with respect to the facts of the case.

State's exhibit 58 shows the gunshot wound to Mr. Lewis's head. The exhibit was relevant to show the injuries sustained by Mr. Lewis, and it was relevant and admissible to aid the jury in understanding the pathologist's testimony.

Exhibit 59 and exhibit 60 depict, respectively, one gunshot wound to Mrs. Lewis's left arm and one to her head. The exhibits showed the extent of her injuries, the cause of her death, and assisted the jury in understanding the testimony of the pathologist. In addition, they assisted the state's proof of deliberation on the part of Brent Rousan and

appellant by illustrating the wounds to Mrs. Lewis's arms that rendered her helpless, as well as the fatal point-blank gunshot wound to her head.

State's exhibits 61 and 62 depict the garment bag that appellant placed over Mrs. Lewis's head after it had been removed from her body, showing a hole in the bag that was caused by a close-range gunshot wound to Mrs. Lewis's head. These exhibits corroborated Robert Rousan's testimony regarding the garment bag and aided the state in proving deliberation.

In sum, each of the photographs was relevant, and this Court cannot say that the allegedly prejudicial impact of these photographs outweighed their probative value. Nor can this Court agree that the admission of the photographs caused the jury to act on the basis of passion, rather than reason, as appellant also alleges. The trial court did not abuse its discretion in admitting exhibits 56 through 62.

## VI.

Appellant contends that the trial court erred in admitting statements he made to the police. He complains that his initial, unrecorded statement was involuntarily given and that his subsequent recorded statements were tainted as a result.

When a defendant challenges the admissibility of a statement or confession on the ground that it was involuntary, the burden of proving voluntariness falls upon the state to show voluntariness by a preponderance of the evidence. *Feltrop,* 803 S.W.2d at 12. The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed. *State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986). In addition to the question of whether the defendant was advised of his rights and understood them, factors to be considered in reviewing the totality of the circumstances include the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs. *See State v. Debler,* 856 S.W.2d at 650; *State v. Bittick,* 806 S.W.2d 652, 658 (Mo. banc 1991). Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986); *see also State v. Feltrop,* 803 S.W.2d at 13.

When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence. *Feltrop,* 803 S.W.2d at 12. Deference is given to the trial court's superior opportunity to determine the credibility of witnesses. *Id.* As in all matters, a reviewing court gives deference to the trial court's factual findings and credibility determinations, but reviews questions of law *de novo.*

The trial court held a pre-trial hearing on appellant's motion to suppress the statements and issued findings and conclusions overruling the motion. Appellant renewed his objection at trial. The trial court overruled the objection as well as the assertion of error in appellant's motion for new trial.

Viewed in the light most favorable to the trial court's ruling refusing to suppress the statements, the facts surrounding appellant's statements are as follows: Appellant was found several days after fleeing from the police in a barn in Washington County. Although armed, he was arrested without incident. He was not wearing shoes and his feet were bruised and bleeding.

Officers transported appellant to the Washington County Jail. While en route, Sheriff Bulloch advised appellant of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant understood each of his rights. He was not questioned, but was advised, in fact, not to make any statements until after he arrived at the jail. He indicated that he understood his rights, and he also commented that he was thirsty and that his feet hurt.

Upon arrival at the Washington County jail approximately fifteen minutes later, appellant was placed in the sheriff's office with a deputy. Upon the arrival of the Missouri State Highway Patrol investigator Joseph Crump at 6:30 p.m., Crump offered appellant food and water. Appellant accepted the water. During the course of the following interview by Crump, appellant was provided with several glasses of water.

Crump advised appellant of his *Miranda* rights. Appellant again stated that he understood his rights and that he wanted to make a statement. He told Crump that he was involved in the murders and that he could lead Crump to the bodies.

At 6:50 p.m., twenty minutes after Crump's arrival, Sergeant William Conway, a Highway Patrol investigator, joined the interview. Both officers questioned appellant for approximately one and one-half hours. During the interview, appellant made additional statements that implicated him in the murders. The interview was not recorded.

At approximately 9:00 p.m., the participants took a one-hour break. During the break appellant was provided a sandwich and paramedics treated his feet. The officers then asked appellant to make a recorded statement. He agreed to the request.

At 10:10 p.m., Investigators Conway and Crump conducted a taped interview of appellant. Once again, prior to commencing the interview, appellant was reminded of his rights. He stated in his own words that if he ever wanted to quit the conversation, he could quit the conversation. In the taped statement, appellant made incriminating remarks that were consistent with those that he made during the unrecorded interview. The taped interview concluded at approximately 11:00 p.m.

At no time prior to or during the interviews did appellant ask for counsel or indicate that he did not want to speak with the investigating officers. No one threatened appellant or made any promises to him. Appellant indicated that he understood what was happening and that he had no mental impairments nor educational limitations. Although his feet were injured, the investigat-ing officers believed that appellant was not in pain. Appellant's responses to the officers' questions were responsive to the questions.

Appellant claims that his confession was rendered involuntary by: the length of the interviews; the lack of medical treatment; the lack of food; and his apparent exhaustion.

■ The length of appellant's interrogation was not coercive, in and of itself. Appellant neither alleges nor demonstrates that the length of the questioning caused him to be unable to resist the questioning. Appellant was in police custody for six hours. During that period he was questioned, at most, for three and one-half hours. He incriminated himself during the initial twenty minutes of the interview. The initial interview was of two to two and one-half hours duration. After the interview, a break was taken for one hour. Appellant was then questioned for an additional fifty minutes. The record does not support appellant's claim that the length of questioning was coercive and rendered his confession involuntary. *See State v. Blackman,* 875 S.W.2d 122, 136 (Mo.App.1994); *State v. Simpson,* 606 S.W.2d 514, 517 (Mo.App.1980).

■ With respect to appellant's claim that the lack of medical treatment for his feet rendered his confession involuntary, he must demonstrate that his injuries were such that his will to resist questioning was overborne. *See State v. Luster,* 750 S.W.2d 474, 478–79 (Mo.App.1988). There is no evidence in this case that appellant was suffering severe pain or that he did not fully understand the subject matter of the conversation. As a consequence, there was no prohibition against his making a voluntary confession to the commission of the crimes. *See State v. Maynard,* 707 S.W.2d 810, 814 (Mo.App.1986). The interviewing officers testified that appellant did not appear to be in any pain from his injuries, and the record is devoid of any suggestion that appellant's receiving medical treatment was in any way conditioned upon his making an incriminating statement. The failure to provide immediate medical attention to appellant's feet did not render his confession involuntary. *See Luster,* 750 S.W.2d at 479.

■ Appellant's assertion that he was deprived of food while in custody is contradicted by the record. The record reflects that appellant was offered food before the interviews commenced and that he declined the offer. During the break between interviews, appellant was given a sandwich. He was provided with water throughout the course of the interviews. His claim in this respect also fails.

■ Appellant's assertion that he was physically exhausted at the time of questioning is also insufficient to prove that his confession was involuntary. The sheriff did describe appellant as being "worn out," but this assessment was completely unrelated to appellant's ability to participate in an interview. There is no showing whatsoever that appellant was so tired that he was unable to resist questioning. The interviews were conducted at a reasonable time, the length of each interview was reasonable, and the recorded interview, made an hour after the unrecorded statement was given, contradicts appellant's claims of exhaustion by showing appellant sufficiently energetic to make a voluntary statement.

Considering the totality of the circumstances, the trial court did not err in finding that appellant's initial unrecorded statement to the police was not the product of police coercion or involuntary. Because the initial confession was not involuntary, appellant's claim that the admission of his audiotaped and videotaped statement were tainted by the involuntary nature of the initial confession also fails.

### VII.

Appellant asserts that the trial court erred in submitting jury Instruction 5, MAI–CR3d 304.04 ("Defendant's Responsibility for Conduct of Another Person"), in conjunction with paragraph 4 of the verdict directing Instructions 6 and 11, MAI–CR3d 313.02 ("Murder in the First Degree"). Appellant contends that since the general accomplice liability instruction, Instruction 5, did not incorporate the element of deliberation in the verdict director, the jury would have been confused as to whether appellant was required to have deliberated before the jury could find him

guilty of first degree murder. In essence, appellant claims that Instruction 5, read together with Instructions 6 and 11, prejudicially confuses the jury as to whether deliberation is required for an accomplice.

Instruction No. 5 stated:

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

Instruction(s) No. 6(11), patterned after MAI–CR3d 313.02, provided as follows:

As to Count I(II), if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 21, 1993, in the County of St. Francois, State of Missouri, Brent Rousan caused the death of Grace (Charles) Lewis by shooting her (him), and

Second that Brent Rousan knew that his conduct was causing or was practically certain to cause the death of Grace (Charles) Lewis, and

Third, Brent Rousan did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Grace (Charles) Lewis, the defendant aided, or encouraged Brent Rousan in causing the death of Grace (Charles) Lewis and did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you will find the defendant guilty under Count I(II) of murder in the first degree. . . .

■ Read together and in context, Instructions 5, 6, and 11 should not have confused the jury. Instruction 5 informed the

jury that it could find appellant guilty as an accomplice if for the purpose of committing the offense he aided or encouraged another person in committing it. Instructions 6 and 11 explained to the jury that it must find four specific facts beyond a reasonable doubt before finding the defendant guilty under Counts I and II of murder in the first degree. The fourth specific fact the jury was required to find was that appellant himself deliberated on the deaths of Charles and Grace Lewis. Appellant's allegation of lack of clarity in Instructions 5, 6, and 11 as they stand together does not merit a finding of error.

## VIII.

Appellant complains of trial court error in sustaining on the ground of irrelevancy the state's objection to appellant's attempt to show that Charles Lewis, IV, was engaged in a struggle with his father for control of the family business and had a motive for the murders. Appellant also sought to show that other family members suspected that Charles Lewis, IV, was involved in his parents' disappearance.

Appellant's proffered evidence clearly was inadmissible to suggest that Charles Lewis, IV, was responsible for the Lewises' deaths. To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. *State v. Wise,* 879 S.W.2d 494, 510 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Umfrees,* 433 S.W.2d 284, 287 (Mo. banc 1968). The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. *Umfrees,* 433 S.W.2d at 288. "Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." *Id.*

In this case, no evidence connects Charles Lewis, IV, with the *corpus delecti* of the murders; therefore, the evidence appellant sought to introduce was irrelevant.

Furthermore, even if, as appellant suggested, Charles Lewis, IV, contracted for the murders, the evidence inculpates, rather than exculpates, appellant in that it bolsters his claim that he participated in a murder for hire.

Appellant argues that the proffered evidence was offered not to cast suspicion on Charles Lewis, IV, but to prove that appellant's statement that he was hired to kill the Lewises by Charles Lewis, IV, was a product "of a police suggestion that Charles IV be implicated in the murder." Appellant's argument, as best as can be understood, is that evidence that Charles Lewis, IV, had a motive to kill the Lewises would corroborate evidence that the police suspected Charles Lewis, IV, of murder, which would prove that police suggested to appellant that he implicate Charles Lewis, IV, in the murders, which would prove that appellant fabricated his story that he was hired to kill the Lewises. Appellant's argument is without merit.

The test for relevancy is whether the offered evidence tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Brown v. Hamid,* 856 S.W.2d 51, 56 (Mo. banc 1993). The sole fact that evidence is logically relevant does not require its admission. *Conley v. Kaney,* 250 S.W.2d 350, 353 (Mo.1952). "If evidence pertaining to collateral matters brings into a case new controversial matters which would result in confusion of issues ... or cause prejudice wholly disproportionate to the value and usefulness of the offered evidence, it should be excluded." *Id.* "The trial court's ruling on admissibility of evidence is accorded substantial deference and will not be disturbed, absent an abuse of discretion." *Brown,* 856 S.W.2d at 56.

Appellant was able to question the highway patrol officers who investigated the Lewises' murders about their suspicion of Charles Lewis, IV, their investigation of him, and their interview of appellant. The record

is devoid of any support for the contention that appellant's statement was a product of police suggestion. There was, therefore, no evidence of police coercion for appellant's proffered evidence to corroborate. Furthermore, to the extent that evidence of Charles Lewis, IV's, motive for the murders of the Lewises would be relevant to appellant's statement, the evidence would tend to support, not undermine, the validity of appellant's story by establishing that Charles Lewis, IV, had a motive to hire appellant. Appellant's bare speculation as to the police's involvement in the fabrication of appellant's confession is insufficient to establish that the trial court abused its discretion in excluding evidence that Charles Lewis, IV, may have had a motive for murdering his parents.

## IX.

Appellant complains of trial court error in admitting into evidence in the penalty phase a video tape that showed injuries to Vicki Mohrenweiser, the victim of another of appellant's offenses. Appellant does not dispute the relevance of this evidence to the issues of appellant's character and criminal history, which are central issues in the penalty phase of first degree murder trials. Rather, appellant claims that the prejudicial effect of this evidence of impact on a victim in another case outweighs the probative value and that the evidence is unduly inflammatory, contributing to the jury's imposition of the death sentence based upon passion rather than reason.

■ Reviewing for plain error because appellant did not preserve his present theories of error in his motion for new trial, this Court finds no manifest injustice. The court admitted a certified copy of appellant's conviction for the assault. The video tape recording of the assault victim's facial injuries was of forty-seven second duration and was followed by an eight second recording of the victim after she recovered from the assault. Details that reflect the seriousness of a prior offense are relevant. *State v. Malone*, 694 S.W.2d 723, 727 (Mo. banc 1985), *cert. denied*, 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986). The presentation of the evidence was brief, and the evidence reflected that the victim had fully recovered from the assault. The point is denied.

## X.

Appellant claims trial court error in rejecting appellant's penalty phase mitigating circumstances instruction, Instruction Z. The instruction included a listing of statutory and non-statutory mitigating circumstances. Appellant claims that the court's failure to instruct on the two non-statutory mitigating factors prevented the jury from giving full consideration to mitigating evidence. Appellant acknowledges that his claim has been repeatedly rejected by this Court. See *State v. Copeland*, 928 S.W.2d 828, 853 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). Appellant nevertheless asks this Court to revisit the issue. There is no reason to do so.

## XI.

Appellant asserts that the trial court erred in reading MAI–CR3d 300.03 ("Before Punishment Voir Dire in a Capital Case") during voir dire. The instruction reads:

At this stage of the jury selection process, the attorneys are permitted to question you concerning your views on punishment. The fact that questions are being asked about punishment at this time should not be taken by you as any indication that the defendant(s) in the case before you (is)(are) guilty of the crime(s) charged. Nothing that is said by the attorneys or by another prospective juror during this process is evidence, and you should not let any such statements influence you in any way.

The possible punishments for the offense of murder in the first degree are imprisonment for life by the Department of Corrections without eligibility for probation or parole; or death. The purpose of this questioning is to discover whether or not you are able to follow the Court's instructions when considering the appropriate punishments.

A case in which the death penalty is a possible punishment is tried in two stages. In the first stage, the jury must decide whether the defendant is guilty or not

guilty. If the defendant is found guilty of murder in the first degree, a second stage is held in which the jury must decide upon the appropriate punishment.

If a second stage is reached in this case, the Court will instruct the jury as to the process it must follow to reach its decision on punishment. For present purposes, you should be aware that a conviction of murder in the first degree does not automatically require that the defendant receive the death penalty. Before the jury may consider imposing the death penalty, it must find, unanimously and beyond a reasonable doubt, that the evidence before it establishes the existence of at least one special fact or circumstance specified by law, called a statutory aggravating circumstance. If no statutory aggravating circumstance is found, the defendant cannot be sentenced to death.

If the jury does find at least one statutory aggravating circumstance, it still cannot return a sentence of death unless it also unanimously finds that the evidence in aggravation of punishment, taken as a whole, warrants the death penalty, and that this evidence is not outweighed by evidence in mitigation of punishment. The jury is never required to return a sentence of death.

■■■ Appellant claims that because the instruction was not approved at the time it was read, there should be no presumption in favor of its validity. This Court, however, allowed use of the instruction before its effective date by order of November 6, 1996. Because the use of the instruction was authorized, the instruction is presumed to have been validly submitted to the jury.

■■■ Appellant offers two grounds for challenge to the instruction. First, appellant contends that the second and third paragraphs of the instruction suggest that the court expects that the prospective jurors will have to consider punishment, thereby indicating the expectation of a finding of guilt. Appellant's argument in this respect is entirely without merit, in view of the language in the first paragraph that instructs the prospective jurors that the fact that questions are being asked about punishment should not be taken by them as any indication that the

defendant is guilty of the crime charged. In addition, the third paragraph explains that "in the first stage" the jury must decide whether the defendant is guilty or not guilty. Finally, the instructions regarding penalty-phase procedures are written in conditional terms. Only "if" the jury finds the defendant guilty in the first stage will there be a second stage. Contrary to appellant's assertion, the instruction, read as a whole, accurately describes the process regarding the penalty phase and the jury's role in it, and the instruction in no way whatsoever suggests to a jury that the guilt of a defendant is a foregone conclusion.

Appellant also asserts that the instruction is flawed because it does not make clear that the jury is required to consider mitigating evidence. Appellant argues that the instruction implies that consideration of mitigating evidence is optional, thereby violating the principle that a jury in a capital case must be given the opportunity fully to consider all mitigating evidence. It appears that appellant is focusing upon the final paragraph of the instruction with respect to this portion of his argument.

Appellant's argument disregards the plain language of the instruction that the jury "still cannot return a sentence of death unless it also unanimously finds that the evidence in aggravation of punishment ... is not outweighed by evidence in mitigation of punishment." Suffice it to say that the language of the instruction is abundantly clear and in no way supports appellant's claim that the jury might believe that its consideration of mitigation evidence is merely optional. Furthermore, when the case proceeded to the penalty phase, the jury in this case, as in all cases that reach the penalty phase, received further instructions in which the court outlined in detail the role of mitigating evidence in the sentencing process and the manner in which the jury was to consider that evidence in reaching its sentencing decision. Appellant's claim is without merit.

## XII.

Appellant asserts that the trial court abused its discretion in overruling his objec-

tion to the portion of the prosecutor's penalty phase closing argument in which the prosecutor stated, "The defense has asked you for mercy and what they are hoping for is weakness. I'm sorry. It's a hard choice. Weakness is something we can no longer afford. Do your duty. Thank you folks." Appellant argues that the prosecutor improperly equated the exercise of mercy through recommending a life sentence with juror weakness. Appellant acknowledges that the remark was isolated, but claims that the remark, in spite of this, had particular force because it was made at the end of the prosecutor's final argument. Appellant contends that the trial court committed reversible error by allowing the statement and that the remark resulted in a sentence of death imposed under the influence of passion, prejudice, or some other arbitrary factor. *See* section 565.035.3(1).

The context of the prosecutor's language was as follows: The prosecutor made the comment during rebuttal in response to the defense's request for mercy. Prior to the objection, the prosecutor stated that the defense had asked for mercy and that "[m]ercy is good." The prosecutor went on to explain, however, that appellant did not deserve mercy under the facts and circumstances of the case. He then concluded as set forth above.

■■■■ Trial courts are vested with considerable discretion in controlling closing arguments and their rulings are reversible only for abuse of discretion. *See State v. Weaver,* 912 S.W.2d 499, 512 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996). Prosecutors can discuss mercy in closing arguments because mercy is a valid sentencing consideration when based on the circumstances of the case, in that a jury can sentence the defendant to life in prison even if it determines that the aggravating circumstances outweigh the mitigating circumstances. *See State v. Clemmons,* 753 S.W.2d 901, 910 (Mo. banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). A prosecutor is allowed to argue that the defendant does not deserve mercy under the facts of a particular case. *State v. Mease,* 842 S.W.2d 98, 109–110 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). Prosecutors

should avoid, however, any suggestion that the jury is weak if it fails to return a certain verdict.

■■■■ The prosecutor's statement was made following a proper discussion with respect to mercy and the jury's role in sentencing. Considering the entire closing argument, the reference to weakness was only part of a larger and otherwise appropriate argument, was isolated and brief, and was not emphasized by the prosecutor. In this context, it cannot be said that the trial court abused its discretion in overruling appellant's objection to the statement. Appellant's related contention that the argument would have caused the jury to return a sentencing verdict based upon passion, prejudice, or other arbitrary factors is likewise without merit.

### XIII.

Appellant asserts that the trial court erred in overruling his motion to dismiss the charges of first degree murder. Appellant claims that he received constitutionally inadequate notice that his actions constituted first degree murder because there is no meaningful distinction between the mental state required for first degree murder and that required for second degree murder either in the statutory definitions contained in sections 565.020.1 and 562.016.3 or in this Court's decisions.

■■■■ Contrary to appellant's assertions, the statutory language of chapter 565 and this Court's decisions clearly distinguish first from second degree murder. A person commits the crime of second degree murder if he "knowingly causes the death of another person." Section 565.021.1(1). A person commits the crime of first degree murder if "he knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1. "Deliberation" is "cool reflection for any length of time no matter how brief." Section 565.002(3). The element of deliberation is the element that separates first degree and second-degree murder. *O'Brien,* 857 S.W.2d at 217–18. Only first degree murder requires "the unimpassioned premeditation that the law calls deliberation." *Id.* at 218. The statutory language of

chapter 565 and this Court's decisions, therefore, plainly distinguish between second and first degree murder by requiring cool reflection for a conviction of murder in the first degree. *See e.g., Clemons,* 946 S.W.2d at 216; *Feltrop,* 803 S.W.2d at 11.

Appellant argues that this Court's interpretation of deliberation as enunciated in *State v. Gray,* 887 S.W.2d 369, 376 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995), eliminates the distinction between first and second degree murder. In *Gray,* this Court stated that "in order to convict [a defendant of first degree murder], there must be some evidence that defendant made a decision to kill the victims prior to the murder." Appellant overlooks that the conviction was affirmed in *Gray* only after finding "sufficient evidence to permit an inference ... that the homicides occurred after [the defendant] coolly deliberated on the deaths for some amount of time, however short." *Id.* at 377. *Gray* does not equate first degree murder with the lesser included offense of knowingly causing the death of another person. The statutes and this Court's decisions plainly defeat appellant's claim.

## XIV.

The trial court submitted to the jury Instruction No. 25, which contained the statutory aggravating circumstances found by the jury in the murder of Grace Lewis. Instruction 25, in pertinent part, provides:

In determining the punishment to be assessed under Count I against defendant for the murder of Grace Lewis, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

\* \* \* \*

4. Whether the defendant directed Brent Rousan to murder Grace Lewis.
5. Whether the murder of Grace Lewis involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant killed Grace Lewis after she was bound or otherwise rendered helpless by defendant or Brent Rousan and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

\* \* \* \*

Appellant asserts that circumstance number 5 and circumstance number 4 are mutually exclusive. Appellant claims that the submissions are inconsistent because the depravity of mind aggravating circumstance, number 5, required the jury to find that "the defendant killed Grace Lewis after she was bound or otherwise rendered helpless," whereas circumstance number 4 required the jury to find that appellant "directed Brent Rousan to murder Grace Lewis." Appellant asserts that he could not have "killed Grace Lewis" at the same time he "directed Brent Rousan to murder Grace Lewis." Appellant points out that while one can commit murder without killing someone, it is "not true that one can kill someone without killing someone."

■ Appellant made no challenge to Instruction 25 on this basis either at trial or in his motion for a new trial; therefore, he has not preserved the issue for review. Ordinarily, the point would be procedurally barred. Because the issue relates to issues required to be addressed under independent review, *see* sec. 565.035.2, however, this Court will review the allegation for plain error resulting in manifest injustice.

■ Appellant is correct in his assertion that aggravating circumstance number 4 and number 5 are inconsistent. As appellant acknowledges, murder can be attributed to an accomplice; consequently, a penalty phase instruction can properly state that an accomplice "murdered" the victim. *See Gray,* 887 S.W.2d at 387. The act of killing, however, is not a legal conclusion that is attributable to an accomplice; therefore, an accomplice cannot be said to have "killed" the victim of a murder. It follows that a defendant who directed another to murder a victim, could not also have "killed" the victim.

Appellant has failed to show, however, that a manifest injustice resulted so as to require a reversal of the death sentence. A review of the entire record shows that the inconsistency would not have caused jury confusion sufficient to undermine confidence in the jury's deliberation during the penalty phase. The state's theory throughout trial, the evidence, and the jury's finding at the close of the guilt phase supported a sole finding that appellant was guilty of first degree murder as an accomplice; therefore, the statement in the depravity of mind aggravator that "defendant killed Grace Lewis" would be insufficient to confuse the jury as to the nature of appellant's involvement in the murders. This conclusion is buttressed by the fact that neither the court nor the attorneys noticed the discrepancy in the instructions during trial. In this context, the use of "killed" instead of "murdered" or "directed to be killed" in the depravity of mind instruction could not have so confused the jury that a miscarriage of justice resulted. *See Gray,* 887 S.W.2d at 387 (finding no plain error in submission of erroneous jury instruction because jury not confused). Furthermore, even if both aggravating circumstances were struck as a consequence of inconsistency, the remaining aggravating circumstances found by the jury would suffice to uphold the penalty of death. *See infra.*

■ In connection with and as is implicit in the foregoing discussion, there is an issue with respect to the sufficiency of the evidence to support the fifth aggravating circumstance that "the *defendant killed Grace Lewis* after she was bound or otherwise rendered helpless by defendant." (emphasis added). Because the evidence showed that appellant directed Brent to kill Mrs. Lewis, but did not kill Mrs. Lewis himself, the evidence was insufficient to support the depravity of mind aggravating circumstance that "the defendant killed Grace Lewis."

■ The finding that one aggravating circumstance is unsupported by the evidence, however, does not require reversal. *See Weaver,* 912 S.W.2d at 522. The jury found the existence of four other aggravating circumstances, each of which is supported by the evidence. It is well-established that only one valid aggravating circumstance need exist to uphold a death sentence. *McMillin,* 783 S.W.2d at 104; *State v. Johns,* 679 S.W.2d 253, 267 (Mo. banc 1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Although appellant asserts that this Court should reexamine this well-settled principle in light of *Tuggle v. Netherland,* 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995), appellant is mistaken. *Tuggle* held that the existence of one valid aggravating circumstance was not necessarily sufficient to uphold a death sentence when there was " a constitutional error in the admission or exclusion of evidence." *Id.* at 14. Appellant's challenge to the aggravating circumstances instruction that "the defendant killed Grace Lewis" includes no claim that any improper evidence was before the jury or any admissible evidence was excluded. *Tuggle,* therefore, is distinguishable, and the finding of the remaining aggravating circumstances requires this Court to uphold the death sentence.[2]

## XV.

Under section 565.035.3, this Court is required to conduct an independent review of the sentence of death.

■ This Court must determine whether appellant's sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor." Section 565.035.3(1). Appellant's specific contentions in this respect are without merit, as discussed above. This Court in its independent review, in addition to having addressed appellant's specific contentions, has reviewed the record in its en-

---

**2.** Appellant asserts in a separate point on appeal that aggravating circumstance number 5, the depravity of mind aggravating circumstance, was too vague to give the jury adequate guidance. Appellant submits that "acted with a callous disregard for the sanctity of all human life" is insufficient to provide proper guidance to a sentencing jury because it is equally as vague as

"outrageously and wantonly vile, horrible and inhuman," language held inadequate in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), without a limiting instruction to guide the jury. For reasons stated in the foregoing discussion, there is no need to address this point.

tirety and determines that the death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

█ This Court is also required to determine "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Section 565.035.3(2). As noted in the preceding point, the jury found five statutory aggravating circumstances related to Mrs. Lewis's murder: that appellant was convicted of rape in the second degree and assault in the second degree; that the murder was committed while appellant was engaged in the unlawful homicide of Mr. Lewis; that appellant directed Brent Rousan to murder her; that her murder was committed while appellant was engaged in the perpetration of a robbery; and that appellant killed Grace Lewis after she was bound or otherwise rendered helpless. The evidence was sufficient with respect to the first four statutory aggravating circumstances. Certified copies of appellant's rape and assault convictions were admitted into evidence and witnesses testified as to the nature of appellant's crimes. Mr. and Mrs. Lewis were murdered one after the other as part of a successful plan to steal their cattle. Appellant directed Brent Rousan to "finish off" Mrs. Lewis after she had been rendered helpless by several gunshot wounds to her arms and by a garment bag that had been placed over her head. The fifth aggravating circumstance is unsupported by the evidence as set forth in point XV.

Finally, this Court must determine whether appellant's sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering ... the crime, the strength of the evidence and the defendant." Section 565.035.3(3).

█ The sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. This case is similar to others in which defendants who were sentenced to death showed callous disregard for life by murdering people who were helpless or rendered helpless. State v. Tokar, 918 S.W.2d 753 (Mo. banc), cert. denied, — U.S. —,

117 S.Ct. 307, 136 L.Ed.2d 224 (1996); State v. Walls, 744 S.W.2d 791 (Mo. banc), cert. denied, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); State v. Mallett, 732 S.W.2d 527 (Mo. banc), cert. denied, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987); State v. Grubbs, 724 S.W.2d 494 (Mo. banc), cert. denied, 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987); State v. Battle, 661 S.W.2d 487 (Mo. banc 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). Appellant's case is similar to others in which defendants murdered the victims for no reason other than to obtain the victims' property. State v. Hunter, 840 S.W.2d 850 (Mo. banc 1992), cert. denied, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993); State v. Ervin, 835 S.W.2d 905 (Mo. banc 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); State v. Ramsey, 864 S.W.2d 320 (Mo. banc 1993), cert. denied, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994).

Appellant does not dispute his involvement in the murders. Appellant's character includes a history of violent criminal offenses.

█ Appellant complains that the co-perpetrators in this case did not receive the sentence of death. The pertinent statute does not require this Court to include such considerations in its proportionality review. Cases resulting in convictions for charges less than first degree murder are not cases in which the "sentence of death or life imprisonment without probation or parole was imposed...." Section 565.035.6. Cases in which the death penalty is waived are cases in which the sentencing authority has no discretion; therefore, there can be no arbitrary and capricious sentencing in such cases. They are not similar cases because the focus of such cases is the prosecutor's exercise of discretion, not the sentencing authority's choice between life or death.

█ Appellant contends that this Court's proportionality review violates due process. Appellant is mistaken. Proportionality review is not constitutionally mandated, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and this Court has repeatedly reviewed and rejected identical

claims. *State v. Richardson,* 923 S.W.2d 301, 329 (Mo. banc), *cert. denied,* — U.S. —, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996); *Weaver,* 912 S.W.2d at 522; *State v. Whitfield,* 837 S.W.2d 503, 514–15 (Mo. banc 1992). Proportionality review is designed as an additional safeguard against arbitrary and capricious sentencing and to promote the even-handed, rational, and consistent imposition of death sentences. *State v. Ramsey,* 864 S.W.2d at 328. That this Court chooses to construe Missouri's statute in a different manner from that urged by appellant does not result in a federal constitutional violation. This Court reminds counsel in this regard that counsel has an obligation to cite all relevant authority, including authority contrary to appellant's position. Appellant's claim in this respect is denied.

The jury's recommendation and the court's imposition of the sentence of death for the murder of Grace Lewis was not disproportionate under all the facts and circumstances presented at trial.

XVI.

The judgment is affirmed.

All concur.