STATE of Missouri, Plaintiff–Respondent,

v.

Timmy JACKSON, Defendant–Appellant.

No. 26880.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 20, 2008.

Motion for Rehearing or Transfer Denied March 13, 2008.

Application for Transfer Denied April 15, 2008.

Gwenda R. Robinson, District Defender, St. Louis, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

After a bench trial, Timmy Jackson (Defendant) was found guilty of murder in the first degree for killing Jimmy Grills

(Grills). *See* § 565.020.[1] Defendant was sentenced to imprisonment for life without the possibility of probation or parole. On appeal, Defendant contends that the trial court erred by: (1) admitting his confessions to police because the statements were involuntary due to the lack of a *Miranda* warning[2] and coercive interrogation tactics; (2) permitting the State, over objection, to present a theory of the crime during closing argument that was inconsistent with the theory presented at the trial of Robert Hudson (Hudson), another participant in Grills' murder; and (3) excluding, as hearsay, the proposed testimony of Linda Hudson (Linda), Hudson's wife, that he said Defendant had nothing to do with Grills' murder.[3] Finding no merit in any of these arguments, this Court affirms the trial court's judgment and sentence.

Defendant does not challenge the sufficiency of the evidence to sustain his conviction. We consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict. *State v. Dillard,* 158 S.W.3d 291, 294 (Mo. App.2005). All contrary evidence and inferences are disregarded. *State v. Lawrence,* 64 S.W.3d 346, 348–49 (Mo.App. 2002). Viewed from that perspective, the favorable evidence and inferences supporting the State's case against Defendant are summarized below.

In the late evening of November 29, 2002, Hudson stopped by Defendant's home. Hudson asked Defendant to help him pick up some money from someone. As Hudson and Defendant drove to the home of Jimmy Grills, Hudson handed Defendant a .22 revolver. Hudson told Defendant that, if anything happened, he should pull the gun out and get the money. Defendant placed the gun in his pocket, and he also was armed with a hunting knife. When they arrived at Grills' home, Hudson asked to borrow some money. Grills said he had none. Hudson demanded all of Grills' money, and Defendant pulled out the revolver. Grills moved toward Defendant and was shot by him. As Hudson and Grills fought, Defendant shot Grills again. The gun malfunctioned after the second shot, so Defendant removed the knife from his pocket. Defendant used the knife to stab Grills and strike him in the head and side. Hudson then took the knife from Defendant and started choking and stabbing Grills. Defendant found Grills' wallet, which had money in it, and placed it in his pocket. While Hudson continued to struggle with Grills, Defendant wandered around the home looking for something else to steal. When he was unable to locate anything else of value, he returned to the living room. Hudson was still on top of Grills, choking and stabbing him. Hudson walked to the bathroom to wash his hands. Still alive, Grills got up and started heading for the door. Defendant knocked Grills back down. Grills reached for the phone, but Defendant ripped the cord from the wall. When Hudson came out of the bathroom, he began stabbing Grills again because he was still alive. Defendant and Hudson then left.

1. All references to statutes are to RSMo (2000).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires that, prior to questioning, any person taken into police custody must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444.

3. Because the Hudsons share the same last name, we will refer to Linda Hudson by her first name for purposes of clarity. No disrespect is intended.

In the early morning hours of November 30, 2002, Shirley Miller (Miller) arrived home to find Grills, who was her boyfriend, lying dead on the floor in a pool of blood. The cause of death was exsanguination due to multiple stab wounds to Grills' head, neck and chest. He also had been shot in the face and right forearm. Additional facts necessary to the disposition of the case are included below as we address Defendant's three points of error.

### Point I—Admission of Defendant's Statements to Police

■ In Defendant's first point, he contends the trial court erred in overruling his motion to suppress and in admitting at trial his oral and videotaped statements to police. At a suppression hearing, "[t]he burden of going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." § 542.296.6; *State v. Franklin*, 841 S.W.2d 639, 644 (Mo. banc 1992). Once Defendant challenged the admissibility of his statements, the State bore the burden of demonstrating by a preponderance of the evidence that the statements were voluntarily, knowingly and intelligently made by Defendant. *State v. Bucklew*, 973 S.W.2d 83, 87 (Mo. banc 1998); *State v. Weicht*, 23 S.W.3d 922, 929 (Mo.App.2000).

■ The trial court decided that the State met its burden. We will not reverse that ruling unless the decision was clearly erroneous, leaving this Court with a definite and firm impression that a mistake was made. *State v. Williams*, 97 S.W.3d 462, 469 (Mo. banc 2003); *State v. Newberry*, 157 S.W.3d 387, 397–98 (Mo.App.2005). Our inquiry is limited to determining whether the decision to deny the motion to suppress is supported by substantial evidence. *State v. Edwards*, 116 S.W.3d 511,

530 (Mo. banc 2003). "In reviewing the trial court's ruling on the matter, this Court considers the record made at the suppression hearing as well as the evidence introduced at trial." *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999). The complete record before the trial court is viewed in a light most favorable to the ruling on the motion to suppress. *State v. Jackson*, 186 S.W.3d 873, 879 (Mo.App. 2006). Therefore, we consider only those facts, as well as the reasonable inferences derived therefrom, that are favorable to the ruling. *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001). We disregard all contrary evidence and inferences. *State v. Kinkead*, 983 S.W.2d 518, 519 (Mo. banc 1998). Viewed in that light, the following additional facts are relevant to the disposition of this point.

In January 2003, Defendant was being held in the Dunklin County Jail on unrelated burglary and stealing charges. Hudson was confined in the same jail. An informant notified police that Defendant knew something about Grills' murder.

On January 22, 2003, Pemiscot County Deputy Ryan Holder (Holder) came to pick up Defendant for questioning. Holder told Defendant that he was being taken to Pemiscot County to take care of a speeding ticket, which was not true. Holder made that statement to prevent Hudson from learning why Defendant was actually talking to police. Holder did not question Defendant while he was being transported. When they arrived at the Pemiscot County Jail, Holder told Defendant that he was not there because of a traffic ticket. Before any questioning took place, Defendant was advised of his *Miranda* rights and signed a written waiver. The questioning was conducted by Missouri Highway Patrol Sergeant Scott Rawson (Rawson). The interview began around 11:45 a.m. and lasted between 60

and 90 minutes. Defendant made a number of statements implicating Hudson as Grills' killer. Defendant also said an ashtray had been taken from Grills' house and hidden by Defendant in a car at his residence. After the interview, Holder and Rawson went to Kennett to verify some of the information provided by Defendant. For example, the officers went to Defendant's house and found the ashtray hidden in the car just as he had described. Rawson and Holder returned and re-interviewed Defendant around 6:30 p.m. He gave a more detailed statement that was videotaped. The gist of this statement was that Hudson had shot and stabbed Grills while Defendant remained outside in the car.

Between the late evening hours on January 22 and the early morning hours of January 23, Rawson and Holder interviewed Hudson about Grills' murder. Hudson gave a statement admitting that he shot Grills and identifying Defendant as the person who stabbed Grills.

In light of Hudson's account of events, Defendant appeared to be more involved in the homicide than he had admitted. Therefore, Rawson and Holder returned to question Defendant again on the afternoon of January 23rd. He was advised of his *Miranda* rights and signed a second, written waiver of those rights. Questioning began at 1:08 p.m. and lasted about three hours. During the course of questioning, Defendant admitted that: (1) he was inside Grills' house with Hudson; (2) Defendant gave Hudson a knife during the fight; and (3) Defendant shot Grills twice and stabbed or cut him as well. After taking a short break, Defendant was advised of his *Miranda* rights a third time and waived them. He then gave a 20–minute videotaped account of how Grills was killed.[4]

All questioning of Defendant ceased at 4:30 p.m.

Prior to trial, defense counsel filed a motion to suppress Defendant's confessions as involuntarily given. At the hearing on the motion, the State presented testimony from Holder and Rawson about Defendant's interrogations which has already been summarized above. In contrast, Defendant testified that he was questioned prior to receiving his *Miranda* warnings and denied counsel when he asked for it. The court also heard testimony from a psychologist who opined that Defendant suffered from a dependent personality disorder, which would make him more susceptible to pressures from interrogating officers. After hearing the evidence, the court made a factual finding that Defendant's statements were made after receiving proper *Miranda* warnings and, considering the totality of the circumstances, were freely and voluntarily made.

On appeal, Defendant claims his confessions were involuntary because: (1) police began interrogating Defendant before advising him of his *Miranda* rights; (2) he was told by police that he did not need an attorney; and (3) his confessions were the product of coercive interrogations. We disagree.

■ The first two prongs of Defendant's argument are based upon his testimony that he was questioned without being given his *Miranda* warnings and that his requests for an attorney went unheeded. That testimony, however, was disputed by Holder and Rawson. The trial court found the officers' testimony credible, and we defer to that determination. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

---

**4.** The favorable evidence supporting Defendant's conviction, which we have already summarized above, was largely drawn from this videotaped statement.

The final prong of Defendant's argument asserts that he was coerced into making statements that conformed to the evidence found by police. "The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed." *Id.* The factors used to make that determination include "whether the defendant was advised of his rights and understood them, the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of physical needs." *State v. Johnson,* 207 S.W.3d 24, 45 (Mo. banc 2006). Absent police coercion, evidence of the defendant's physical or emotional condition alone is not sufficient to demonstrate that his or her confession was involuntary. *Id.*

Defendant was informed of his *Miranda* rights multiple times and waived them each time. When a defendant is repeatedly given *Miranda* warnings and voluntarily waives his rights, that fact weighs in favor of a finding that the defendant's confession was voluntary. *State v. Simmons,* 944 S.W.2d 165, 173 (Mo. banc 1997). Defendant did present evidence that he suffered from a dependent personality disorder and that such disorder could have made him more susceptible to pressures applied during interrogation. The trial court, however, was not persuaded by such evidence. Moreover, a defendant's mental condition, by itself and apart from police coercion, should never dispose of the inquiry into the voluntariness of a statement. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Schnick,* 819 S.W.2d 330, 337 (Mo. banc 1991). "Absent police conduct caus-ally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly,* 479 U.S. at 164, 107 S.Ct. 515.

Defendant argues that the false statement made to him about the reason why he was being taken from the jail by Holder is evidence of coercion. The trial court did not accept that argument, and its decision is supported by the evidence. Defendant was being held in the same jail as Hudson on charges unrelated to Grills' murder. Holder initially told Defendant that he was being transferred to another jail because of a speeding ticket. Holder testified, however, that the true reason was to separate Defendant from Hudson without the latter discovering the real reason why police were questioning Defendant. As soon as Defendant arrived at the Pemiscot County Jail and before interrogation began, he was told the truth: there was no speeding ticket, and the police really wanted to talk to him about Grills' murder. Defendant also was advised of his *Miranda* rights, which he waived. Defendant does not explain how this single statement by police in any way coerced his confession, and we are unable to perceive any such causal connection. *See State v. Phillips,* 563 S.W.2d 47, 54 (Mo. banc 1978) (police trickery does not necessarily make a statement involuntary, unless it can be shown the defendant's will was overcome); *State v. Davis,* 980 S.W.2d 92, 96 (Mo.App. 1998) ("statements obtained through subterfuge are admissible unless the deception offends societal notions of fairness or is likely to procure an untrustworthy confession").

Additionally, the length of Defendant's interrogation was not, in and of itself, coercive. Defendant was interrogated on two separate occasions by the police. The first interrogation only lasted

between 60 and 90 minutes and led to Defendant's admission of being present when the crime occurred. He was not interrogated again until the next day after additional investigation suggested he was more involved in the murder than he had revealed. The second interrogation only lasted a little over three hours and included a ten-minute break. Nothing in the record suggests that Defendant's physical needs were not met during either interrogation session. There is substantial evidence in the record supporting the court's decision that the length of Defendant's interviews were not coercive and did not render his statements involuntary. *See State v. Rousan,* 961 S.W.2d 831, 846 (Mo. banc 1998); *State v. Blackman,* 875 S.W.2d 122, 136 (Mo.App.1994).

In short, the trial court decided that Defendant's statements to police were freely and voluntarily made after he received proper *Miranda* warnings. After reviewing the record, we do not find that ruling to be clearly erroneous. Defendant's first point is denied.

*Point Two—Improper Closing Argument*

In Defendant's second point, he contends the trial court erred in overruling an objection to the State's closing argument. This contention is based on the following facts. During the opening portion of the State's closing argument, the prosecutor stated:

The evidence shows that [Defendant] had a gun in his pocket when he went into to [sic] Mr. Grills'. [Hudson] gave him the gun on the trip to Mr. Grills'. The Court will remember that this is by [Defendant's] own admissions in the video tape that the Court has already seen. [Defendant] was familiar with the gun, and in target practice with it [sic]. [Defendant] knew they were going there to get some money, because by his own

statement in his video, the second video, he said [Hudson] told him that, after he gave, after [Hudson] gave [Defendant] the pistol, if anything happens, pull the gun, get the money.

Defense counsel objected that the State had called Defendant as a witness in Hudson's prior trial to prove one version of events and was now arguing a different version of events to convict Defendant. The prosecutor responded by noting that he had offered all three versions of Defendant's statements at Hudson's trial and argued that he was guilty of first degree murder under any version presented. The trial court overruled the objection. On appeal, Defendant argues that the court's ruling improperly allowed the State to argue a theory of conviction in Defendant's case that was inconsistent with the theory used to prosecute Hudson. For the following reasons, we are unable to agree.

First, Defendant's argument is based upon the premise that the State presented a different version of events to convict Hudson at his trial than was presented here to convict Defendant. To support this argument, Defendant has tendered a transcript and legal file from Hudson's trial and asked that it be included as part of the record on appeal in this case. We note, however, that these materials were never considered by the trial court or made part of the trial record in Defendant's case. "An appellate court is limited to consideration of the evidence in the record." *State v. Thomas,* 965 S.W.2d 396, 402 n. 3 (Mo.App.1998). Therefore, we must disregard the materials from the Hudson trial in ruling on the issue presented here. *State v. Pendergrass,* 869 S.W.2d 816, 819 n. 1 (Mo.App.1994). Based on the record before us, there is nothing to demonstrate that the State used factually inconsistent theories to convict Hudson and Defendant of the same crime. More importantly, "there is no

rule requiring the state to argue mirror-image theories in the separate prosecutions of co-perpetrators." *State v. Nicklasson,* 967 S.W.2d 596, 621 (Mo. banc 1998). Thus, after trying Hudson's case, the State would not have been collaterally estopped from taking an inconsistent position in Defendant's trial. *See State v. Nunley,* 923 S.W.2d 911, 926 (Mo. banc 1996); *State v. Fondren,* 810 S.W.2d 685, 687–88 (Mo.App.1991).

Second, a trial court has broad discretion in determining the allowable scope of closing argument. *State v. Forrest,* 183 S.W.3d 218, 226 (Mo. banc 2006). A court's ruling "will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant." *State v. Deck,* 136 S.W.3d 481, 488 (Mo. banc 2004). A party is entitled to argue inferences justified by the evidence. *State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996); *State v. Dismang,* 151 S.W.3d 155, 163 (Mo.App.2004). Based on our review of the record in this case, the prosecutor's summation merely stated reasonable inferences that could be drawn from Defendant's statements to the police.

 Finally, Defendant's argument ignores the fact that this was a court-tried case. A judge is presumed to be able to disregard inappropriate or improper argument and proceed to a fair result. *State v. Mullins,* 140 S.W.3d 64, 71 (Mo.App.2004); *State v. Goodwin,* 65 S.W.3d 17, 24 (Mo.App.2001); *State v. Mandrell,* 754 S.W.2d 917, 920–21 (Mo.App.1988); *State v. Harris,* 710 S.W.2d 324, 326 (Mo.App.1986). We see nothing in the record to suggest the trial court based its decision on anything other than the evidence presented. Defendant's second point is denied.

### Point Three—Exclusion of Hearsay Testimony

In Defendant's last point on appeal, he contends the trial court erred in excluding Linda's testimony regarding a conversation she had with Hudson. The following facts are relevant to our consideration of this issue.

At Defendant's trial, the parties stipulated that Hudson was unavailable to testify. Linda is Defendant's mother and is married to Hudson. She was called as a defense witness and testified that she had visited Hudson in jail shortly after he and Defendant were charged with Grills' murder. According to Linda, she asked Hudson about what had happened. When she was asked to recount Hudson's answer, the State interposed a hearsay objection. The court sustained the objection and allowed Defendant to make this offer of proof:

Q. What did Robert Hudson say to you?

A. Well, I'd ask him about this, and I had asked him did [Defendant] have anything to do [with] it and he said no, no, [Defendant] did not having [sic] nothing to do with it.

Q. Was that the extent of the conversation?

A. Yeah.

Q. Was it clear to you he was talking about the death of Jimmy Grills?

A. Yeah.

On cross-examination, Linda admitted that she had originally told the police that Hudson had been at home with her on the night of the murder, which was not true. She also assisted Hudson in disposing of the gun used to kill Grills. Finally, she acknowledged that, when she visited with Defendant in jail, he "admitted to [her] that he was involved in this crime."

 A trial court possesses broad discretion in the admission and exclusion of evidence at trial. *State v. Madorie,* 156 S.W.3d 351, 355 (Mo. banc 2005). A rever-

sal is warranted only when a trial court has clearly abused its discretion. Id. To constitute such an abuse of discretion, the court's ruling must have been clearly against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration. *State v. Gonzales,* 153 S.W.3d 311, 312 (Mo. banc 2005). "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Forrest,* 183 S.W.3d 218, 224 (Mo. banc 2006). Defendant admits that Linda's testimony was hearsay, but argues that the exclusion of Linda's testimony was error because Hudson's statement met the necessary requirements to be admitted as a due process right. We disagree.

As our Supreme Court explained in *State v. Davidson,* 982 S.W.2d 238 (Mo. banc 1998):

> A declaration against a penal interest is not admissible as an exception to the hearsay rule, *State v. Blankenship,* 830 S.W.2d 1, 6 (Mo. banc 1992), but may be admissible as a due process right of the defendant only if the declarant is shown to be unavailable as a witness, there are considerable assurances of the statement's reliability, and the statement, if true, would exonerate the defendant. *State v. Jennings,* 815 S.W.2d 434, 448 (Mo.App.1991). Three indicators of reliability are set out in *Chambers v. Mississippi,* 410 U.S. 284, 300–301, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973): the statement needs to be (a) unquestionably against interest, (b) spontaneously made to a close acquaintance, and (c) corroborated by other evidence in the case.

*Id.* at 242. In our view, the trial court did not abuse its discretion in excluding the statement because it lacked the considerable assurances of reliability that are a prerequisite to admissibility.

At the outset, it is apparent that Hudson's statement fails to qualify as a declaration against his penal interest because it is not inculpatory. He did not admit that he committed, or was even involved in, Grills' murder; instead, he simply asserted that Defendant did not have anything to do with it. This statement is not "in a very real sense self-incriminatory and unquestionably against interest." *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *State v. Smulls,* 935 S.W.2d 9, 21 (Mo. banc 1996). Next, Hudson did not make the statement spontaneously. It was in direct response to a question from Linda. *See State v. Guinn,* 58 S.W.3d 538, 546 (Mo.App.2001). Her own credibility as a witness was suspect because of her direct involvement in the attempt to conceal the crime. Finally, the statement that Defendant had nothing to do with the crime was not corroborated by other evidence in the case. *See Smulls,* 935 S.W.2d at 21; *State v. Turner,* 623 S.W.2d 4, 9 (Mo. banc 1981). Defendant admitted his involvement in the murder to Linda. He also confessed to the police. The details of his confessions were consistent with physical evidence found at the murder scene.[5] Evidence from the crime scene was found in Defendant's car. Defendant's third point is denied.

The trial court's judgment is affirmed.

BARNEY and LYNCH, JJ., concur.

---

5. For example, Defendant told police that the .22 revolver "fell apart" after the second shot was fired. During the investigation, police located three unfired .22 bullets on the floor of Grills' home.