STATE of Missouri, Plaintiff–Respondent,

v.

Cebron Cordell FINLEY, Defendant–Appellant.

No. SD 31647.

Missouri Court of Appeals, Southern District, Division One.

Aug. 29, 2012.

Margaret M. Johnston, Office of State Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Shaun Mackelprang, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, P.J.

Cebron Cordell Finley ("Defendant") appeals his convictions after the trial court found him guilty of the class A felony of domestic assault in the first degree (§ 565.072, RSMo Cum.Supp.2008) and felony armed criminal action (§ 571.015, RSMo 2000). Defendant claims the trial court plainly erred when it failed to intervene *sua sponte* and indicate what it considered to be the applicable law when the State allegedly misstated the law in its closing argument regarding the requisite proof of Defendant's intent to cause serious physical injury. Finding no error, plain or otherwise, we affirm.

### Factual and Procedural Background

Defendant was charged with committing the class A felony of domestic assault in the first degree and the unclassified felony of armed criminal action. On the domestic assault charge, Count I, the information filed by the State alleged that defendant "knowingly caused serious physical injury

to [M.Y.] by shooting her in the face, and [M.Y.] and defendant were family or household members in that [M.Y.] and defendant were adults who resided together and were in a continuing social relationship of a romantic nature." Count II alleged that Defendant committed the "felony of domestic assault in the first degree by, with and through the use, assistance and aid of a deadly weapon."

Defendant waived his right to a jury trial and was tried by the court. He was found guilty on both counts and was sentenced to thirty years' imprisonment on the domestic assault in the first degree offense and ten years' imprisonment on the armed criminal action offense. Both sentences were ordered to be served concurrently.

Defendant does not challenge the sufficiency of the evidence to support his convictions. The evidence relevant to this appeal, viewed in the light most favorable to the trial court's judgment, *see State v. Manley*, 223 S.W.3d 887, 889 (Mo.App. 2007), established the following. M.Y. and Defendant had been romantically involved for a couple of years when they moved into a duplex together in July 2010. During their involvement, Defendant was often physically, mentally, and verbally abusive toward M.Y., however, she never reported the abuse because she "was scared" and did not want Defendant to go to jail.

On August 9, 2010, M.Y. was awakened between 2:00 and 3:00 a.m., when Defendant came home. Defendant was drunk, and M.Y. was upset and went back to bed. Defendant wanted to have sex, but she did not. Defendant then asked M.Y. if she wanted to play Russian Roulette. He got up, and when he returned, he had a .357–caliber Magnum revolver in his hand and was spinning the chamber. M.Y. told Defendant to lie down, that "[h]e was being stupid and drunk." Defendant lay down on his stomach next to M.Y., who was on her back, pointed the revolver at her and pulled the trigger. The gun did not fire, and M.Y. told Defendant to stop. However, Defendant pointed the gun at her again, and M.Y. raised her arms to cover her face. Defendant pulled the trigger a second time, but the gun did not fire again. M.Y. covered her arms and face with a blanket, keeping her arms raised over her face, and pleaded with Defendant to stop. When Defendant pulled the trigger a third time, he shot M.Y. The bullet went through both arms, shattering a bone in her right arm, grazed the bridge of her nose, entered her left eye and shattered the bone around her left eye socket, and exited her left temple. She lost her left eye and now has a prosthetic eye.

M.Y. asked Defendant to call 911 and take her to the hospital, but Defendant ran outside. M.Y. got up and moved toward the front porch, screaming, "Are you just going to let me die here?" She kept repeating that and begging him to take her to the hospital. She was walking out the door and holding her head when Defendant returned. Defendant's car was parked on the next block, but M.Y. could not make it that distance, and she lay down on the curb while Defendant got the car. On their way to the hospital, Defendant told M.Y. that he did not want to go to jail and pleaded with her to tell the police that there had been an intruder and a scuffle, and she was shot in the process.

Defendant was interviewed by law enforcement officers at the hospital. Defendant "seemed upset" and told the officers that while he and M.Y. were in bed, someone entered their house and attacked him. Defendant claimed that he kept a pistol next to the wall when he slept, and when he was attacked, he grabbed the gun and it went off while he wrestled with the intruder. Defendant told the officers that he

gave chase to the intruder, but when he saw some cops outside, he threw down the gun and returned home to find that M.Y. had been shot. He then took her to the hospital. Defendant did not claim it was an accident, and he never told police that he thought the gun was unloaded.

Detective Larry Swinehart investigated and photographed the scene of the shooting. He recovered a .357–caliber Magnum revolver from bushes outside of the home and a bullet from bedding inside the home. Three rounds, including one spent cartridge, remained in the gun's six-shot chamber. Three bullets were later recovered from the floorboard in Defendant's vehicle.

When she was first interviewed, M.Y. told police that she opened her door and let inside "a white male with a blue hat" and then she lay down again. Defendant and this intruder "were scuffling about something and the gun went off." She testified at Defendant's trial that she lied to the police because she feared Defendant was still there at the hospital and she "was scared of him." When the police told her Defendant would soon be released from jail because they did not have enough information to charge him, she admitted she had lied about an intruder coming in. She told the police what had actually happened because she did not want Defendant to be released from jail.

In his defense, Defendant testified at trial that he bought an unlicensed, loaded gun on the street on the same day of the shooting.[1] He claimed he believed the gun was unloaded when he took it into the house, because when he exited his vehicle with the gun, the chamber fell open, and he shook the gun, causing the bullets to fall out. Three unspent bullets were found on the floorboard of his vehicle. Defendant stated that he lay down on his stomach holding the gun and was playing with the trigger. He told M.Y. the gun looked "like one of these old Russian Roulette guns." While he "was just kind of messing with this new gun ... just trying to figure it out[,]" he pulled back the hammer and "it pulled the trigger." The gun did not fire that time, but when he cocked the hammer again, it fired and hit M.Y. Defendant testified he did not point the gun at M.Y. and she was sitting in that direction. Defendant testified that, on their way to the hospital, he fabricated a story that he shot her while scuffling with an intruder because he did not want to go to jail.

The trial court further heard rebuttal testimony from a jailer who overheard Defendant talking to other inmates shortly after the shooting. He testified that on August 24, 2010, he heard Defendant say, "Yeah, I shot her with a .40 right here." The jailer testified that Defendant pointed to where he shot her and was "[v]ery cocky" and "bragging about it like he was almost proud of it."

During closing argument, the prosecutor and defense counsel argued differing views of the evidence necessary to support a finding that Defendant "knowingly caused serious physical injury" to M.Y., as required by section 565.072. The actual portions of the prosecutor's argument about which Defendant now complains are included in the appendix at the end of this opinion.

In his sole point on appeal, Defendant contends "[t]he trial court plainly erred in failing to intervene *sua sponte*

---

1. The trial court was not required to believe any part of Defendant's testimony. *State v. Chavez,* 165 S.W.3d 545, 549 (Mo.App.2005). That part of Defendant's testimony that is not favorable to the trial court's judgment is provided to give context to Defendant's claim on appeal.

during the State's argument and in finding [Defendant] guilty of first-degree domestic assault and armed criminal action without indicating its position in the conflict between the state's and defense's legal arguments about what the state was required to prove[.]"[2] Defendant alleges the State's argument, "that [Defendant] was guilty of knowingly causing serious physical injury to the victim[,]" misstated the law because Defendant claimed "he thought the gun was unloaded and he was shocked when he saw what happened to the victim after he pulled the trigger[.]" Furthermore, he alleges, proving that Defendant knowingly caused serious physical injury "would be impossible if [Defendant] truly believed the gun was not loaded after he thought he had emptied the bullets from the gun, whether or not he was intoxicated." Defendant asserts that "[a] manifest injustice has resulted because [Defendant's] defense was that he did not intend to shoot the victim, but the court might have found [Defendant] guilty under the state's erroneous statement of the law, and it is impossible to tell which legal argument the court selected."

Defendant concedes he raised no objection to the State's argument and requests plain error review, pursuant to Rule 30.20.[3]

### Standard of Review

▇▇▇ Rule 30.20 is no panacea for unpreserved error, and does not justify review of all such complaints, but is used sparingly and limited to error that is evident, obvious, and clear. [N]ot all prejudicial error—that is, reversible error—can be deemed plain error. A defendant's Rule 30.20 burden is much greater—not merely to show prejudice, but manifest injustice or a miscarriage of justice—which in this context means outcome-determinative error.

We are not required to review for plain error; to do so is within our discretion. The two-step analysis is (1) did the trial court commit evident, obvious, and clear error affecting the defendant's substantial rights; and (2) if so, did such plain error actually result in manifest injustice or a miscarriage of justice? Unless a defendant gets past the first step, any inquiry should end.

*State v. Smith,* 293 S.W.3d 149, 151 (Mo. App.2009) (internal citations and quotations omitted).

### Discussion

▇▇▇ This was a court-tried case. Trial judges are presumed to know the law and to apply it in making their decisions. *State v. Poole,* 216 S.W.3d 271, 277 (Mo. App.2007). This is why, even assuming that the complained of argument was improper, a determination we need not address, no error—plain or otherwise—could have resulted from it. *State v. Mullins,* 140 S.W.3d 64, 71 (Mo.App.2004); *State v. Mandrell,* 754 S.W.2d 917, 921 (Mo.App. 1988); *State v. Harris,* 710 S.W.2d 324, 326 (Mo.App.1986). Unlike a jury, a judge in a court-tried case "is presumed to be able to disregard the most inappropriate,

2. "Multiple claims of error in one point relied on render[ ] the point multifarious and as such is a violation of Rule 84.04, made applicable to briefs in criminal appeals by Rule 30.06(c)." *State v. Agee,* 350 S.W.3d 83, 96–97 (Mo.App.2011) (quoting *State v. Garrison,* 276 S.W.3d 372, 379 n. 4 (Mo.App.2009)). "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal." *Id.* Where, however, non-compliance with briefing requirements does not impede appellate review, as here, we may exercise our discretion to proceed in addressing the point on it merits. *State v. Yarbrough,* 332 S.W.3d 882, 886 (Mo.App. 2011).

3. All rule references are to Missouri Court Rules (2012).

improper material and proceed to a fair result." *Mullins*, 140 S.W.3d at 71 (quoting *State v. Goodwin*, 65 S.W.3d 17, 24 (Mo.App.2001)); *see also State v. Martin*, 388 S.W.3d 528 (Mo.App.2012); *State v. Jackson*, 248 S.W.3d 117, 125 (Mo.App. 2008). Therefore, this court presumes, regardless of any argument made by counsel, the trial court here was aware of the requisite mental state necessary to support a guilty finding on charges of domestic assault in the first degree and armed criminal action and accordingly decided the case. Defendant directs us to nothing in the record to support that the trial court acted or decided the case in any other manner.

In the argument portion of his brief, Defendant fails to recognize or acknowledge a court-tried versus jury-tried distinction in analyzing alleged errors related to the closing argument. Indeed, every case cited in Defendant's brief in support of his claim involved a jury-tried case. Yet, Defendant makes no argument and cites no legal authority for why this court should apply principles in a court-tried case related to error in closing arguments in jury-tried cases. Moreover, he cites no court-tried cases supporting his claim and, most telling, completely ignores the *Harris–Mandrell–Goodwin–Mullins–Martin–Jackson* line of cases, *supra*, which are adverse to his claim. As a result, Defendant has not cited this court to any legal authority that requires a trial court in a court-tried case to *sua sponte* intervene and correct an erroneous closing argument or that requires a trial court in a court-tried case to indicate in any manner "its position in the conflict between the state's and defense's legal arguments." This failure to cite relevant authority preserves nothing for appellate review. *State v. Harrington*, 756 S.W.2d 647, 649 (Mo.App. 1988).

Finding that Defendant has not established any evident, obvious, and clear error by the trial court affecting his substantial rights, we end our plain-error inquiry. *See Smith*, 293 S.W.3d at 151. Defendant's point is denied.

### *Decision*

The trial court's judgment is affirmed.

NANCY STEFFEN RAHMEYER and WILLIAM W. FRANCIS, JR., JJ., concur.

### *Appendix*

The portions of the prosecutor's argument about which Defendant complains are set forth below:

> And, Your Honor, he doesn't have to intend to have shot her in the face. He doesn't have to intend to put her eye out. He didn't have to intend for the bullet to go through both of her arms. He has to intend the act. And that was a deliberate act every single time, pointed the gun, pulled the hammer back and pulled the trigger. Actions that required his thought process. Actions that he knew he was taking as he took them.
>
> \* \* \* \*
>
> This wasn't an accident, Your Honor. The defendant acted knowingly when he pointed that gun at [M.Y.]. When he pulled the hammer back. When he put his finger on the trigger and pulled that trigger three different times until that bullet fired. He may have been shocked when he saw what that bullet did to [M.Y.], to her arms and to her face. But that did not negate the fact that his actions were deliberate.

Defense counsel argued the following:

> Your Honor, I believe that the prosecutor in this case has misstated the law. . . . [T]o be guilty of [assault in the first degree,] the actor must knowingly

cause the serious physical injury. Obviously, it is hard to get into someone's head as the prosecutor point out and know what they were thinking when they fired or when they hurt someone or when they acted. And we have to look at what happened before, during and after to try to piece together their mind set.

But it still says knowingly cause physical injury. Not knowingly acted to do something that ended up causing serous physical injury. He had to know. And we can infer from what happened, and the Court is free to do so, but he had to-this Court would have to find that he knowingly caused[ ] that kind of serious physical injury to her.

In rebuttal closing argument, the prosecutor further stated:

Your Honor, obviously, the defendant and I disagree about what the law is. Assault First is not the same as murder and the elements are not the same and the mens rea that's required is not the same. And the definition of knowingly, as I understand the law[,] is that a person acts knowingly when he's aware of his conduct. He's practically certain to cause the result. And when you take a loaded gun and by his own testimony when he arrived at home that night there were six bullets in the gun, and he says he dropped it and three fell out, that means that there were three more in the gun.

And he cannot use his voluntary intoxication to say I didn't know it was loaded. I thought all the bullets were out. Three in the back seat. Three are still in the gun, and he knew that when he went inside. And when he said, "Let's play Russian Roulette." And he pointed at her and he pulled the trigger, pulled

the hammer back and pulled the trigger[,] those are knowing actions.

And he is aware that that conduct that he is pulling the trigger with three bullets in the gun is practically certain that the gun is going to fire. And the only reason it doesn't fire the first time, is because he had one of the empty cylinders. And the only reason it doesn't fire the second time is because he has another empty cylinder. And he fires a third time, and he finally hits a bullet. And if it had been empty a third time, he would have cocked it and fired it a fourth time. He was going to fire the gun until it shot.

And those, Your Honor, are knowing actions. That's what the defendant did. The fact that he was shocked when he saw how bad it was does not negate the knowing act of pointing the gun, pulling that hammer back and pulling that trigger.

That's what he did. And that's what he's guilty of, and that's why he's guilty of Assault in the First Degree not reckless. This was not reckless. He wasn't playing with a gun and it accidentally went off. He deliberately pointed at her. He deliberately cocked it and he deliberately fired it three times.